# QSP, INC., ET AL. *v.* THE AETNA CASUALTY AND SURETY COMPANY ET AL.
## (SC 16269)
## (SC 16270)

Borden, Katz, Palmer, Sullivan and Vertefeuille, Js.*

---

\* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued November 28, 2000—officially released June 5, 2001

*Frances J. Brady,* with whom were *Jerold Oshinsky* and, on the brief, *Samuel L. Jefferson, Jr., Michael T.*

*Sharkey* and *Marilyn B. Fagelson,* for the appellants (plaintiffs).

*Alan H. Barbanel,* pro hac vice, with whom were *Michael C. Deakin* and, on the brief, *Peter D. Clark, Stephen D. Treuer,* pro hac vice, and *Thomas E. Greiff,* pro hac vice, for the appellee (defendant General Star National Insurance Company).

*Bruce D. Celebrezze,* pro hac vice, with whom were *Linda L. Morkan, Theodore J. Tucci* and, on the brief, *Jeffrey A. Meyers,* pro hac vice, and *Stephen E. Goldman,* for the appellees (defendants American Manufacturers Mutual Insurance Company et al.).

*David F. Bennett, William T. Corbett, Jr.,* pro hac vice, and *William J. Metcalf,* pro hac vice, filed a brief for the appellee (defendant Federal Insurance Company).

*Opinion*

SULLIVAN, J. This appeal arises from a declaratory judgment action filed by the plaintiffs, Reader's Digest Association, Inc. (Reader's Digest), and QSP, Inc. (QSP), with respect to a controversy with the defendants, American Manufacturers Mutual Insurance Company and American Motorists Insurance Company (collectively American Motorists), General Star National Insurance Company (GenStar) and Federal Insurance Company (Federal),[1] over potential insurance coverage to be provided by the defendants under commercial general liability and excess liability policies that they had issued to the plaintiffs. The policies covered, among other things, the defense of actions based on advertising or personal injury. The plaintiffs sought a declaration as to whether they were entitled, under

---

[1] The appeal does not involve Travelers-Aetna Insurance Company, Fireman's Fund Insurance Company, or TIG Insurance Company, which were all defendants in the underlying action.

the terms of any or all of the policies effective during the relevant time period, to the defense of and indemnification for an underlying antitrust class action filed in federal court and entitled *Roman Catholic Bishop of San Diego* v. *Reader's Digest Assn., Inc., & QSP, Inc.*, United States District Court, Docket No. 93-1953-IEG (CM) (S.D. Cal.) (*Bishop* action).[2] The trial court concluded that the defendants were not under a duty to defend the plaintiffs in the *Bishop* action. We agree and therefore affirm the judgment.

The following facts and procedural history are relevant to the disposition of the issues on appeal. QSP is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Ridgefield. It is a wholly owned subsidiary of Reader's Digest. Reader's Digest is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Pleasantville, New York. American Motorists sold commercial general liability insurance coverage to Reader's Digest for the period from 1990 to 1996.[3] GenStar and Federal provided excess liability coverage to Reader's Digest from 1989 to 1994. QSP, as a subsidiary of Reader's Digest, is covered as an insured under the relevant policies.

---

[2] Prior to the filing of the *Bishop* action, QSP's competitors in the school and youth group magazine fund-raising market filed in California Superior Court an action entitled *Burkett* v. *Reader's Digest Assn., Inc.*, San Diego County Superior Court, Docket No. 621222. The *Burkett* complaint alleged state law causes of action including defamation, business disparagement and unfair competition. The *Burkett* action was dismissed with prejudice pursuant to a settlement agreement entered into in May, 1993. The Aetna Casualty and Surety Company exhausted its $1 million policy limits in settling the *Burkett* action.

[3] American Manufacturers Mutual Insurance Company sold Reader's Digest a commercial general liability policy for the period from 1990 to 1991. American Motorists Insurance Company took over coverage with policies issued during the period from 1991 through 1996.

In December, 1993, the plaintiffs in the *Bishop* action filed their federal antitrust class action lawsuit, alleging that QSP and Reader's Digest had violated federal antitrust laws by monopolizing the school and youth group magazine fund-raising market. The class of plaintiffs in the *Bishop* action consisted of all school-related entities in the continental United States that had purchased magazine fund-raising programs from QSP in any one or more years from 1990 to 1993. The *Bishop* plaintiffs alleged that QSP and Reader's Digest had eliminated or weakened competition in the school fund-raising market by conducting "anticompetitive, predatory and exclusionary acts" including, but not limited to: (1) defamation of the character and competence of their competitors; (2) commercial disparagement; (3) unfair competition; and (4) threatening and instituting bad faith litigation as part of a campaign of anticompetitive disparagement[4] as a result of the alleged unlawful conduct of Reader's Digest and QSP. The *Bishop* plaintiffs claimed that they were deprived of substantial magazine fund-raising revenues that they otherwise would have received if there were competition in the market. They further claimed that, because of the diminished revenue, they were forced to cut important educational and extracurricular programs and activities.

QSP and Reader's Digest entered into a settlement agreement with the *Bishop* plaintiffs in October, 1996. The terms of the settlement expanded the class of *Bishop* plaintiffs to include all United States schools that had purchased magazine fund-raising programs from QSP between 1990 and 1995, and obligated Read-

---

[4] Reader's Digest and QSP also were accused of practicing predatory and discriminatory pricing, interfering with competitors' contracts, making false representations to potential customers, making exclusive dealing arrangements with the publishers of the magazines participating in the fund-raising programs, using the valuable Reader's Digest name to further their monopoly position, and threatening potential members of the class action with legal action based on allegations of legal and ethical violations.

er's Digest and QSP to pay members of the class of *Bishop* plaintiffs $15 million, plus certain additional cash equivalents.[5] QSP and Reader's Digest gave notice of the lawsuit and settlement to their primary carriers, American Motorists, which refused either to defend them in the *Bishop* action or to reimburse them for costs incurred in defending or settling the class action lawsuit. American Motorists stated that their insurance policies covered only claims by competitors, and did not cover claims by customers, like the *Bishop* plaintiffs, who alleged damages flowing from the anticompetitive conduct of the insured. Additionally, American Motorists argued that their policy provisions covering "advertising injury," "advertising offense," and "personal injury" did not cover federal antitrust violations when those violations "arose out of" covered offenses, such as defamation, disparagement, malicious prosecution or unfair competition, where those offenses had not been committed against the *Bishop* plaintiffs.[6] GenStar and Federal, as Reader's Digest's excess liability carriers, also refused to defend Reader's Digest and QSP or indemnify them for damages awarded in the *Bishop* action under the "advertising offense" section of their policies, claiming that the *Bishop* plaintiffs' injuries arose out of the existence of a monopoly, rather than out of unfair competition committed in the course of advertising activities.[7]

---

[5] The cash equivalents consisted of products including books, videos, music and discount coupons valued at $25 million.

[6] On March 21, 1994, American Motorists sent a letter to Reader's Digest denying coverage or indemnification for the *Bishop* action.

[7] Specific to GenStar's policy was a modified definition of "advertising offense" from one of the relevant policy periods. That definition included as an "advertising offense" "(3) piracy or unfair competition or idea misappropriation under an implied contract . . . ."

GenStar's policy also contained a "New York Amendatory Endorsement" that added the following exclusion: "(n) to personal injury or property damage resulting from any intentional act committed by or at the direction of the Insured."

GenStar forwarded a letter to Reader's Digest denying coverage and indemnification on August 10, 1994.

QSP and Reader's Digest filed the present action in the Superior Court in response to the insurance companies' refusal to defend or indemnify them in the underlying *Bishop* action. In their complaint, QSP and Reader's Digest alleged that because the antitrust complaint in the underlying *Bishop* action alleged defamation, commercial disparagement, bad faith litigation and unfair competition, they were entitled to defense and indemnification on the ground that their insurance policies expressly covered claims arising out of those offenses. The defendants responded that there was no duty to defend because: (1) the *Bishop* action was based solely on allegations of illegal monopolization and antitrust violations, rather than any offenses enumerated under the relevant policy provisions; and (2) the *Bishop* plaintiffs did not suffer any direct injury as a result of the alleged offenses.

In a thorough and well reasoned decision, the trial court, *Levin, J.*, granted the cross motions by the defendants for summary judgment.[8] The trial court found that "the defendants were not under a duty to defend [QSP and Reader's Digest] in the *Bishop* action because (1) the *Bishop* plaintiffs [did] not state facts showing defamation, disparagement, malicious prosecution or unfair competition [as recognized under the 'personal injury,' 'advertising injury' or 'advertising offense' sections of the American Motorists and GenStar policies]; (2) the

---

[8] In its memorandum of decision, the trial court, *Levin, J.*, rendered a decision on whether the law of Connecticut or the law of New York governed the consequences of the defendants' alleged breach of their duty to defend their insureds. Applying the Restatement (Second), Conflict of Laws, §§ 6 and 188, as adopted in *Reichhold Chemicals, Inc.* v. *Hartford Accident & Indemnity Co.*, 243 Conn. 401, 404, 703 A.2d 1132 (1997), the trial court held that "the substantive law of Connecticut govern[ed] the scope of the defendants' respective duties to defend QSP's claims and the substantive law of New York govern[ed] the scope of the defendants' respective duties to defend [Reader's Digest's] claims." The choice of law issue is not raised on appeal, and, therefore, we adopt the decision of the trial court with respect thereto.

*Bishop* plaintiffs did not allege that they were the targets of those offenses; and (3) the antitrust injuries which the *Bishop* plaintiffs [did] allege [did] not 'arise out of' these torts." QSP and Reader's Digest appealed to the Appellate Court on their motion, and the matter was transferred to this court pursuant to Practice Book § 65-2.[9] We agree with the conclusions of the trial court and, therefore, affirm its judgment.[10]

On appeal, QSP and Reader's Digest claim that the trial court, in granting the defendants' cross motions for summary judgment, improperly concluded that the defendants had no duty to defend or indemnify them in the underlying antitrust action. QSP and Reader's Digest challenge the trial court's granting of summary judgment in the insurers' favor, relying on the settled principle that "an insurer's duty to defend, [is] much broader in scope and application than its duty to indemnify, [and] . . . [t]he obligation of the insurer to defend does not depend on whether the injured party will suc-

[9] Practice Book § 65-2 provides: "After the filing of an appeal in the appellate court, but in no event after the case has been assigned for hearing, any party may move for transfer to the supreme court. The motion, addressed to the supreme court, shall specify, in accordance with provisions of Section 66-2, the reasons why the party believes that the supreme court should hear the appeal directly. A copy of the memorandum of decision of the trial court, if any, shall be attached to the motion. The filing of a motion for transfer shall not stay proceedings in the appellate court.

"If, at any time before the final determination of an appeal, the appellate court is of the opinion that the appeal is appropriate for supreme court review, the appellate court may file a brief statement of the reasons why transfer is appropriate. The supreme court shall treat the statement as a motion to transfer and shall promptly decide whether to transfer the case to itself."

QSP and Reader's Digest also filed a motion for transfer to the Supreme Court, which the defendants opposed. Despite the opposition, the motion was granted.

[10] The original judgment of the trial court granted summary judgment in favor of American Motorists and GenStar. Pursuant to a motion for articulation, the trial court amended its judgment to include Federal, also concluding that it had no duty to defend or indemnify.

cessfully maintain a cause of action against the insured but on whether he has, in his complaint, stated facts which bring the injury within the coverage." (Citation omitted; internal quotation marks omitted.) *Springdale Donuts, Inc.* v. *Aetna Casualty & Surety Co. of Illinois,* 247 Conn. 801, 807, 724 A.2d 1117 (1999). QSP and Reader's Digest argue that, because the antitrust claim in the underlying *Bishop* action was couched in terms of defamation, commercial disparagement, bad faith litigation and unfair competition, they were entitled to defense and indemnification under the "personal injury," "advertising injury" and "advertising offense" sections of the relevant policies. We conclude that these allegations do not trigger the defendants' duty to defend.

Before addressing the merits of this dispute, we set forth the standard of review for summary judgment which is well established. "Summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Internal quotation marks omitted.) *Orkney* v. *Hanover Ins. Co.,* 248 Conn. 195, 201, 727 A.2d 700 (1999); see Practice Book § 17-49.

Our standard of review with respect to insurance contracts is also well settled. "It is the function of the court to construe the provisions of the contract of insurance. . . . The [i]nterpretation of an insurance policy . . . involves a determination of the intent of the parties as expressed by the language of the policy . . . [including] what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . [A] contract of insurance must be viewed in its entirety, and the

intent of the parties for entering it derived from the four corners of the policy . . . [giving the] words . . . [of the policy] their natural and ordinary meaning . . . [and construing] any ambiguity in the terms . . . in favor of the insured . . . ." (Citations omitted; internal quotation marks omitted.) *Springdale Donuts, Inc.* v. *Aetna Casualty & Surety Co. of Illinois*, supra, 247 Conn. 805–806.[11] " '[B]ecause the proper construction of a policy of insurance presents a question of law, the trial court's interpretation of the policy is subject to de novo review on appeal.' " Id., 806; see also *Imperial Casualty & Indemnity Co.* v. *State*, 246 Conn. 313, 322 n.6, 714 A.2d 1230 (1998).

"It is well established [however] that a liability insurer has a duty to defend its insured in a pending lawsuit if the pleadings allege a covered occurrence, even though facts outside the four corners of those pleadings indicate that the claim may be meritless or not covered . . . ." (Citation omitted.) *Fitzpatrick* v. *American Honda Motor Co.*, 78 N.Y.2d 61, 63, 575 N.E.2d 90, 571 N.Y.S.2d 672 (1991); see also, e.g., *Ruder & Finn, Inc.* v. *Seaboard Surety Co.*, 52 N.Y.2d 663, 669–70, 22 N.E.2d 518, 439 N.Y.S.2d 858 (1981). "[T]he oft-stated principle [is] that the duty to defend is broader than the duty to indemnify . . . ." (Citation omitted.) *Fitzpatrick* v. *American Honda Motor Co.*, supra, 65.

## I

## PERSONAL INJURY

We begin our analysis with a review of the language of the American Motorists policies. The American

---

[11] " 'A necessary predicate to this rule of construction, however, is a determination that the terms of the insurance policy are indeed ambiguous. . . . The fact that the parties advocate different meanings of the [insurance policy] does not necessitate a conclusion that the language is ambiguous.' " *Springdale Donuts, Inc.* v. *Aetna Casualty & Surety Co. of Illinois*, supra, 247 Conn. 806.

Motorists' commercial general liability policies provide that the insurer "will pay those sums that the insured becomes legally obligated to pay as damages because of [a] 'personal injury' . . . to which this coverage part applies. [The insurer] will have the right and duty to defend any 'suit' seeking those damages. . . . [The insurer] may . . . investigate any 'occurrence' . . . and settle any claim or 'suit' that may result. . . ." Section V (10) of the policy provides in relevant part that " '[p]ersonal injury' means injury, other than 'bodily injury,' arising out of . . . malicious prosecution . . . [or] [o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services . . . ."[12] An " 'occurrence' " is defined in section V (9) as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." In order for the allegations of the underlying complaint to fall within the policy coverage for "personal injury," the complaint must allege an injury that "arose out of" one of the offenses listed in the policy.

QSP and Reader's Digest first contend that the trial court improperly concluded that the defendants had no duty to defend them in the *Bishop* action because it is an action for federal antitrust violations not covered by the policies. More specifically, QSP and Reader's Digest claim that the trial court should have found coverage because the charges of federal antitrust violations in the *Bishop* action rested on underlying allegations of defamation, disparagement and malicious prosecution,

---

[12] As pointed out by the trial court, although American Motorists Insurance Company and American Manufacturers Mutual Insurance Company "use different language in some respects, the coverage and exclusions of each are materially similar in all aspects relevant to this appeal." *Microtec Research, Inc.* v. *Nationwide Mutual Ins. Co.*, 40 F.3d 968, 969 (9th Cir. 1994). The excess liability policies issued by GenStar and Federal contain similar language under the "advertising offense" provision.

all covered offenses under the "personal injury" section of the American Motorists policy. We disagree.

As stated previously, the duty to defend does not arise only when the injured party can successfully maintain a cause of action against the insured. That duty arises when the complaint states facts that bring the injury within the policy coverage. See *Moore* v. *Continental Casualty Co.*, 252 Conn. 405, 409, 746 A.2d 1252 (2000) ("[i]f an allegation of the complaint falls even possibly within the coverage, then the insurance company must defend the insured"). "On the other hand, if the complaint alleges a liability which the policy does not cover, the insurer is not required to defend." (Internal quotation marks omitted.) *Springdale Donuts, Inc.* v. *Aetna Casualty & Surety Co. of Illinois*, supra, 247 Conn. 807; see also *First Investors Corp.* v. *Liberty Mutual Ins. Co.*, 152 F.3d 162, 165 (2d Cir. 1998) (duty to defend under New York law "exceedingly broad" but not without limits). "[T]he duty to defend derives . . . not from the complaint [as] drafted by a third party, but rather from the insurer's own contract with the insured . . . ." *Fitzpatrick* v. *American Honda Motor Co.*, supra, 78 N.Y.2d 68.

QSP and Reader's Digest claim that the following allegations in the *Bishop* complaint trigger coverage under the "personal injury" provisions of the American Motorist policy:[13] (1) paragraph 29 (c) alleges that QSP and Reader's Digest "*defamed* the character and competence of individual owners, officers, agents and employees of *competitors* . . . by falsely stating . . . that such individuals had embezzled or stolen large sums of money, had been fired by QSP for dishonesty or incompetence, or had illegally taped conversations"; (emphasis added); (2) paragraph 29 (d) alleges that QSP

[13] Paragraph 29 of the *Bishop* complaint had thirteen subparagraphs enumerating all of alleged offenses committed by QSP and Reader's Digest.

and Reader's Digest *"disparaged competing firms* by misrepresenting their reliability, capability, integrity and financial stability" through false statements; (emphasis added); (3) paragraph 29 (e) alleges that QSP and Reader's Digest *"threatened and instituted bad faith litigation"* as part of their campaign of anticompetitive disparagement. (Emphasis added.)

QSP and Reader's Digest claim that because the *Bishop* complaint describes the underlying offenses in terms of defamation, disparagement and malicious prosecution, there is at least a possibility of coverage. The defendants, on the other hand, argue that the *Bishop* plaintiffs simply were using these tort-based descriptions to identify the primary charge: wilful violation of federal antitrust laws by Reader's Digest and QSP. We agree with the defendants and conclude that there is no duty to defend under the personal injury provision of the American Motorists' policy because the *Bishop* plaintiffs are not the proper parties to raise the allegations that QSP and Reader's Digest claim trigger coverage, nor did the *Bishop* plaintiffs suffer any injury that would be causally connected to any offense covered under "personal injury."

First, we address the claim by QSP and Reader's Digest that paragraph 29 (c) of the *Bishop* complaint, which alleges that QSP and Reader's Digest *"defamed* the character and competence of individual owners, officers, agents and employees of competitors"; (emphasis added); brings the *Bishop* action within their policy coverage under the "personal injury" provision as defined previously. The trial court disagreed, concluding that "[b]ecause the *Bishop* plaintiffs did not allege that they themselves were defamed, the *Bishop* action did not allege a claim for defamation which the defendants were required to defend." We agree with the trial court. Where the alleged defamatory statements were not made about the *Bishop* plaintiffs, they

do not satisfy the "of and concerning" element crucial to prevailing on a common-law defamation claim. See *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 795, 734 A.2d 112 (1999); *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 27, 662 A.2d 89 (1995); see also *Eckhaus* v. *Alfa-Laval, Inc.*, 764 F. Sup. 34, 37 n.4 (S.D.N.Y. 1991); 3 Restatement (Second), Torts § 564 and comment (a) (1976) ("[a] defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer").[14]

In order for QSP and Reader's Digest to establish that the *Bishop* plaintiffs suffered prima facie defamation, they must show that: (1) QSP and Reader's Digest made a defamatory statement; (2) the defamatory statement identified the *Bishop* plaintiffs to a reasonable third person; (3) the defamatory statement was published to a third person; and (4) the *Bishop* plaintiffs' reputation suffered injury as a result of the defamatory statement. See *Lizotte* v. *Welker*, 45 Conn. Sup. 217, 219–20, 709 A.2d 50 (1996), aff'd, 244 Conn. 156, 709 A.2d 1 (1998); see also 3 Restatement (Second), supra, § 559 ("[a] communication is defamatory if it tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him"). Where a plaintiff cannot prove a fundamental element of the underlying tort, e.g., defamation, a claim for personal injury coverage will be denied. See *Liberty Bank of Montana* v. *Travelers Indemnity Co. of America*, 870 F.2d 1504, 1508 (9th Cir. 1989); *Brooklyn Law School* v. *Aetna Casualty & Surety Co.*, 661 F. Sup. 445, 453 (E.D.N.Y. 1987).

[14] The United States Supreme Court also has found that it is constitutionally required that a statement be made "of and concerning" the party allegedly defamed for a cause of action in defamation to lie. See *Rosenblatt* v. *Baer*, 383 U.S. 75, 80–82, 86 S. Ct. 669, 15 L. Ed. 2d 597 (1966); *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 267, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964).

The *Bishop* plaintiffs were not the parties about whom the defamatory statements allegedly had been made by QSP and Reader's Digest, nor had the *Bishop* plaintiffs suffered any harm to their reputation from the alleged defamation. Instead, as the *Bishop* complaint suggests, QSP and Reader's Digest defamed "individual owners, officers, agents and employees *of competitors* in the school/youth group magazine fund raising market . . . ." (Emphasis added.) QSP and Reader's Digest do not provide any authority that the "of and concerning" element is unnecessary when establishing a cause of action for defamation. See, e.g., *Auvil* v. *CBS 60 Minutes*, 800 F. Sup. 941, 944 (E.D. Wash. 1992) (court aware of no case law suggesting that publication not "of and concerning" identifiable target can be converted into "of and concerning" attack due to actions of third parties). They argue only that no "of and concerning" requirement appears in the policy language. This observation is inapposite because we interpret the words of the policies according to their "common, ordinary and customary meaning." *Izzo* v. *Colonial Penn Ins. Co.*, 203 Conn. 305, 309, 524 A.2d 641 (1987). In this case, it was the competitors of QSP and Reader's Digest who allegedly were defamed, and they have been compensated through the settlement of a separate underlying action brought on their behalf entitled *Burkett* v. *Reader's Digest Assn., Inc.*, San Diego County Superior Court, Case No. 621222 (*Burkett* action). The *Bishop* plaintiffs make no claim for damages arising out of defamation. We conclude, therefore, that QSP and Reader's Digest are not entitled to "personal injury" coverage for defamation charges that never were alleged in the *Bishop* complaint. If the *Bishop* plaintiffs did suffer damages as a result of the defamation by QSP and Reader's Digest of their magazine fund-raising competitors, those damages were indirect and only tenuously related to that defamatory conduct.

We next address the argument by QSP and Reader's Digest that the *Bishop* complaint states a cause of action for commercial disparagement, also known as "injurious falsehood" or "trade libel," committed by QSP and Reader's Digest against their competitors. Paragraph 29 (d) of the *Bishop* complaint alleges in relevant part that QSP and Reader's Digest "disparaged competing firms by misrepresenting their reliability, capability, integrity and financial stability" by falsely alleging, among other things, that they did not deliver magazine orders despite having been paid. Included in the definition of "personal injury" in the American Motorists' policy is coverage for injuries arising out of the "[o]ral or written publication of material that . . . disparages a person's or organization's goods, products or services . . . ."

Defamation or disparagement of a business' goods and services may be considered trade libel; *Securitron Magnalock Corp.* v. *Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995), cert. denied, 516 U.S. 1114, 116 S. Ct. 916, 133 L. Ed. 2d 846 (1996); *Van-Go Transport Co.* v. *Board of Education*, 971 F. Sup. 90, 98 (E.D.N.Y. 1997); and is recognized by Connecticut and New York courts as a species of defamation. See *Charles Parker Co.* v. *Silver City Crystal Co.*, 142 Conn. 605, 612, 116 A.2d 440 (1955); *Proto* v. *Bridgeport Herald Corp.*, 136 Conn. 557, 566, 72 A.2d 820 (1950); see also *Ruder & Finn, Inc.* v. *Seaboard Surety Co.*, supra, 52 N.Y.2d 670–71 (where statement impugns basic integrity or creditworthiness of business, action for defamation lies and injury conclusively presumed); *Jurlique, Inc.* v. *Austral Biolab Pty., Ltd.*, 187 App. Div. 2d 637, 639, 590 N.Y.S.2d 235 (1992) ("trade defamation is the knowing publication of a false matter derogatory to the plaintiff's business calculated to prevent or interfere with relationships

between the plaintiff and others to its detriment").[15] In order to sustain an action for commercial disparagement, an insured must "[paint] a picture which . . . conceivably could subject [it] to liability for commercial disparagement." *Tews Funeral Home, Inc.* v. *Ohio Casualty Ins. Co.*, 832 F.2d 1037, 1043 (7th Cir. 1987), citing *Ruder & Finn, Inc.* v. *Seaboard Surety Co.*, supra, 862.

The torts of trade libel and commercial disparagement, like defamation, require that the alleged damaging statement be made concerning the plaintiff. See *Unelko Corp.* v. *Rooney*, 912 F.2d 1049, 1050 (9th Cir. 1990), cert. denied, 499 U.S. 961, 111 S. Ct. 1586, 113 L. Ed. 2d 650 (1991) (claims for product disparagement or

---

[15] "The terminology in this area is somewhat confusing. False communications which damage or tend to damage the reputation as to quality of goods or services are variously described as 'disparagement,' 'product disparagement,' 'trade libel,' or 'slander of goods.' False communications which impugn the plaintiff's title to goods or to real property are usually denominated 'slander of title.' In the law of defamation, 'slander' connotes oral and 'libel' written communication but 'trade libel,' 'slander of goods,' and 'slander of title' are used without regard to the manner of publication.

"Product disparagement and slander of title are grouped together in the Restatement (Second) of Torts § 623A . . . under the more general term 'injurious falsehood,' defined as any false communication which results 'in harm to interests of another having pecuniary value'; the definition is broad enough to cover some cases of defamation. Other authorities use 'injurious falsehood' as a synonym for product disparagement while still others suggest that 'injurious falsehood' be defined as communications of false matter which result in harm to interests of another having pecuniary value but which do not constitute defamation, disparagement, or slander of title." *System Operations, Inc.* v. *Scientific Games Development Corp.*, 555 F.2d 1131, 1138 n.6 (3d Cir. 1977); see also W. Prosser, Torts (4th Ed. 1971) § 128, pp. 915–20.

"[D]efamation and disparagement in the commercial context are allied in that the gravamen of both are falsehoods published to third parties . . . . [More specifically, however] [w]here a statement impugns the basic integrity or creditworthiness of a business, an action for defamation lies and injury is conclusively presumed. [But] [w]here, however, the statement is confined to denigrating the quality of the business' goods or services, it could support an action for disparagement . . . ." (Citations omitted.) *Ruder & Finn, Inc.* v. *Seaboard Surety Co.*, supra, 52 N.Y.2d 670–71.

trade libel or tortious interference with business relationships subject to same first amendment requirements that govern defamation); *Erlich* v. *Etner*, 224 Cal. App. 2d 69, 73, 407 P.2d 649, 36 Cal. Rptr. 256 (1964) (cause of action for injurious falsehood or disparagement resembles that for defamation). This is consistent with our treatment of business disparagement like defamation, requiring that the statement that disparages a person's goods or services be made "of and concerning" the person stating the cause of action. See, e.g., *Charles Parker Co.* v. *Silver City Crystal Co.*, supra, 142 Conn. 609–15; *Ruder & Finn, Inc.* v. *Seaboard Surety Co.*, supra, 52 N.Y.2d 670–71. Not only were the *Bishop* plaintiffs not harmed in their trade or business, but no such claim of business disparagement was made by the *Bishop* plaintiffs in their complaint.

It is clear from the allegations of the *Bishop* complaint that any commercially disparaging conduct on the part of QSP and Reader's Digest had been directed against their competitors and not against the *Bishop* plaintiffs. Because the *Bishop* plaintiffs were not the targets of the alleged commercial disparagement committed by QSP and Reader's Digest, the complaint simply does not give rise to a disparagement action. As a result, the complaint did not trigger coverage for commercial disparagement under the defendants' policies.

We finally address the claim by QSP and Reader's Digest that the *Bishop* plaintiffs' allegations of "malicious prosecution" triggered personal injury coverage.[16]

---

[16] At trial, the counsel for QSP and Reader's Digest raised the issue of abuse of process as a component of malicious prosecution. We have addressed the difference between the two torts. "The action of malicious prosecution lies where a civil or criminal action has been instituted with malice and without probable cause, and has terminated unsuccessfully. The plaintiff must allege and prove that the original action, whether civil or criminal, was instituted without probable cause, with malice, and that it terminated in his favor." *Schaefer* v. *O. K. Tool Co.*, 110 Conn. 528, 532, 148 A. 330 (1930). "Abuse of process is the misuse of process regularly issued to accomplish an unlawful ulterior purpose. The gravamen of the complaint is the use of process for a purpose not justified by law. The distinction between malicious prosecu-

In a malicious prosecution or vexatious litigation action, "it is necessary to prove want of probable cause, malice and a termination of [the] suit in the plaintiffs' favor." *DeLaurentis* v. *New Haven*, 220 Conn. 225, 248, 597 A.2d 807 (1991).[17] "[Establishing] a cause of action for vexatious suit requires proof that a civil action has been prosecuted not only without probable cause but also with malice. *Bridgeport Hydraulic Co.* v. *Pearson*, 139 Conn. 186, 194, 91 A.2d 778 (1952) . . . . It must also appear that the litigation claimed to be vexatious terminated in some way favorable to the defendant therein." (Citation omitted.) *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole*, 189 Conn. 518, 538, 457 A.2d 656 (1983).[18]

---

tion or vexatious suit and abuse of process as tort actions is that in the former the wrongful act is the commencement of an action without legal justification, and in the latter it is in the subsequent proceedings, not in the issue of process but in its abuse." Id.; *Vandersluis* v. *Weil*, 176 Conn. 353, 356, 407 A.2d 982 (1978). Because we conclude that the *Bishop* plaintiffs do not satisfy the elements for a malicious prosecution claim, we also conclude that they do not meet the elements for a claim of abuse of process. See *Koehring Co.* v. *American Mutual Liability Ins. Co.*, 564 F. Sup. 303, 311 (E.D. Wis. 1983) (theoretical legal distinction between malicious prosecution and abuse of process not so clear that insurance coverage of one should exclude coverage of other without specific exclusion in policy).

[17] "A vexatious suit is a type of malicious prosecution action, differing principally in that it is based upon a prior civil action, whereas a malicious prosecution suit ordinarily implies a prior criminal complaint." *Vandersluis* v. *Weil*, 176 Conn. 353, 356, 407 A.2d 982 (1978). Where there is a settlement, as in the *Bishop* action, it is routine for courts to deny that a lawsuit has terminated in one or another party's favor. See *Blake* v. *Levy*, 191 Conn. 257, 264, 464 A.2d 52 (1983); see also *Pinsky* v. *Duncan*, 898 F.2d 852, 858 (2d Cir. 1990) ("[w]hen a lawsuit ends in a negotiated settlement or compromise, it does not terminate in the plaintiff's favor and therefore will not support a subsequent lawsuit for vexatious litigation" [internal quotation marks omitted]).

[18] Under New York law, the plaintiff must prove the following in order to bring a cause of action for malicious prosecution: (1) the initiation of an action by the defendant against the plaintiff; (2) that the action was instituted with malice; (3) that the action was instituted without probable cause to believe it would succeed; and (4) that the action terminated in the plaintiff's favor. See *O'Brien* v. *Alexander*, 101 F.3d 1479, 1484 (2d Cir. 1996).

The *Bishop* plaintiffs did not allege that they had suffered injury as a result of "malicious prosecution" or "vexatious litigation." In paragraph 29 (e) of the *Bishop* complaint, the *Bishop* plaintiffs alleged that QSP and Reader's Digest "threatened and instituted bad faith litigation" as part of their campaign of anticompetitive disparagement. Paragraph 29 (m) also alleged that QSP and Reader's Digest "made unfounded allegations of possible legal and ethical violations, and have threatened to initiate actions against individual lawyers and their firms if they participated in [the *Bishop*] action."[19] Again, we conclude that, because the *Bishop* plaintiffs did not allege that they had suffered personal injury due to vexatious litigation or malicious prosecution, personal injury coverage was not triggered.

QSP and Reader's Digest rely on *Ethicon, Inc.* v. *Aetna Casualty & Surety Co.*, 737 F. Sup. 1320 (S.D.N.Y. 1990), in which the court found a duty to defend in an antitrust action that, when stripped of its antitrust label, met the requirements for a malicious prosecution claim in California. The present case is different. In *Ethicon, Inc.*, the plaintiffs in the underlying antitrust action

---

[19] During oral argument on the motion for summary judgment the following colloquy occurred regarding the interpretation of paragraph 29 (m) of the complaint by the counsel for QSP and Reader's Digest:

"[Counsel for QSP and Reader's Digest]: Paragraph (m) . . . makes the argument a little more interesting from our perspective, because . . . it's clear they're saying not only did you . . . use or threaten to use litigation in . . . an abusive way, but you did against our guys, directly to us, the schools, not just against the third persons. . . .

"The Court: 29 (m) isn't—isn't quite that explicit. . . .

"[Counsel for QSP and Reader's Digest]: I think, if you read it together with (e) . . . I agree, Your Honor, standing alone it . . . could be more explicit. But—

"The Court: . . . Actually, if you read it together with (e), (e) would seem to reference back to (d), which—seems to be disparagement of the competing firms.

"[Counsel for QSP and Reader's Digest]: I think that's right. . . . I think a fair reading of (e) probably ties it back to (d), but that's not a hundred percent clear, by any means."

were also the victims of the vexatious litigation. As a result, the court held that they satisfied the elements necessary to raise such a claim and trigger personal injury coverage. Id., 1333. The *Bishop* plaintiffs, on the other hand, are not claiming injuries as a result of vexatious litigation and do not base their complaint on that charge.

In this case, the threats of litigation were lodged against competitors of QSP and Reader's Digest, and their lawyers, not the *Bishop* plaintiffs. The use of the phrase "bad faith litigation" in their description of the antitrust allegations does not bring the *Bishop* complaint within the policy coverage. Therefore, the *Bishop* complaint was not a personal injury action arising out of vexatious litigation or malicious prosecution and could not trigger personal injury coverage under that policy language.

## II

## ADVERTISING INJURY

QSP and Reader's Digest also make a claim for coverage under the "advertising injury" and "advertising offense" provisions of the American Motorists and GenStar policies. First, they claim that "the *Bishop* complaint's allegation that [Reader's Digest] and QSP engaged in a 'campaign' of disparagement, misstatements to customers in promoting [Reader's Digest] and QSP, and subsidizing promotional activities constitute advertising." Second, QSP and Reader's Digest argue that several subparagraphs of paragraph 29 of the *Bishop* complaint give rise to coverage under GenStar's policies for the advertising offense of unfair competition. The trial court concluded that "[b]ecause the *Bishop* complaint did not allege that any wrong covered by the defendants' policies was caused by advertising, there was no duty to defend under the advertising injury [or] advertising offense coverage of either [the Ameri-

can Motorists or GenStar policies]" and that the *Bishop* complaint did not allege a cause of action for unfair competition under the advertising offense provision of the GenStar and Federal policies because "it neither alleged the misappropriation of a commercial advantage belonging to the *Bishop* plaintiffs, nor [did it allege] that the *Bishop* plaintiffs suffered [a] competitive injury."

QSP and Reader's Digest challenge the trial court's conclusions and argue that: (1) the term "advertising" should be defined broadly, to include a "campaign" of conduct; and (2) the term "unfair competition" also should be defined broadly to include underlying allegations of antitrust violations, even where the acts constituting such violations are not committed directly against the parties bringing the cause of action. We are not persuaded by their argument and, therefore, agree with the conclusions of the trial court.

We first address the claim of QSP and Reader's Digest that the defendants have a duty to defend under the "advertising injury" and "advertising offense" sections of their policies. Section V (1) of the American Motorists policies provides in relevant part that " '[a]dvertising injury' means injury arising out of . . . [o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services . . . ." This coverage applies to only " '[a]dvertising injury' caused by an offense committed in the course of advertising [the insured's] goods, products or services . . . ." GenStar's policy language defines " 'Advertising Offense' " in relevant part as any "(1) libel, slander or defamation . . . [or] (3) piracy or *unfair competition* or idea misappropriation under an implied contract . . . ." (Emphasis added.) The policy states that GenStar will "defend any suit against the Insured seeking damages on account of . . . [an] advertising offense," where

such offense is "committed or alleged to have been committed in any advertisement, publicity article, broadcast or telecast and arising out of the Named Insured's advertising activities."

A

The trial court in this case defined " 'advertisement,' " according to its dictionary definition, as " 'the act or process of advertising . . . a public notice; esp: one published in the press or broadcast.' Webster's Ninth New Collegiate Dictionary (1991)." We defined the word "advertise" in *Schwartz* v. *Planning & Zoning Commission*, 208 Conn. 146, 155, 543 A.2d 1339 (1988), as follows: "to announce publicly esp[ecially] by a printed notice or a broadcast; [and] to call public attention to esp[ecially] by emphasizing desirable qualities so as to arouse a desire to buy or patronize." "Black's Law Dictionary defines advertising in a manner that would include such dissemination of information [as]: [a]ny oral, written, or graphic statement made by the seller in any manner in connection with the solicitation of business . . . ." (Internal quotation marks omitted.) *Elan Pharmaceutical Research Corp.* v. *Employers Ins. of Wausau*, 144 F.3d 1372, 1377 (11th Cir. 1998). As pointed out by the trial court, in New York, advertising has been defined by the courts as "the calling of information to the attention of the public, by whatever means." *Koffler* v. *Joint Bar Assn. Grievance Committee*, 51 N.Y.2d 140, 146, 412 N.E.2d 927, 432 N.Y.S.2d 872 (1980).

"Courts have differed over precisely what type of conduct constitutes advertising activity. A number of courts have defined the term expansively to include even individual sales pitches to individual consumers; but other courts have defined it more narrowly." *Elan Pharmaceutical Research Corp.* v. *Employers Ins. of*

*Wausau*, supra, 144 F.3d 1376.[20] The court in *Elan Pharmaceutical Research Corp.* stated that "[a] plain and ordinary reading of the definition of advertising activity in [the insurer's] policies would include an insured's dissemination of information to promote a product or service." Id., 1377. "Moreover, the courts that have considered the issue of advertising activity in similar contexts have defined it in terms that include the dissemination of information to promote a product. See e.g., *Smartfoods, Inc.* v. *Northbrook Property & Cas. Co.*, 35 Mass. App. Ct. 239, 243–44, 618 N.E.2d 1365, 1368 (1993) ('[A]dvertising means a public announcement to proclaim the qualities of a product. . . . Wide dissemination of information is typically the objective of advertising.') . . . ." *Elan Pharmaceutical Research Corp.* v. *Employers Ins. of Wausau*, supra, 1377 (dissemination of clinical studies to develop market for one of Elan's products appears to fall well within definition of advertising activity provided in insurance policies and case law). A common theme, however, is the requirement that information must be publicly or widely disseminated in order to be considered "advertising." See *Delta Pride Catfish, Inc.* v. *Home Ins. Co.*, 697 So. 2d 400, 403 (Miss. 1997).

QSP and Reader's Digest argue that the term "advertise" should be broadly defined; see *Amsel* v. *Brooks*, 141 Conn. 288, 299, 106 A.2d 152 (1954) (term " 'advertise' " covers "a wide range . . . through [a] whole gamut of means and devices for arousing public interest

---

[20] In *Elan Pharmaceutical Research Corp.* v. *Employers Ins. of Wausau*, supra, 144 F.3d 1376, the court compared *John Deere Ins. Co.* v. *Shamrock Industries, Inc.*, 696 F. Sup. 434, 440 (D. Minn. 1988) (relying on Black's Law Dictionary for proposition that solicitation of one person's business constitutes advertising), aff'd, 929 F.2d 413 (8th Cir. 1991), with *First Bank & Trust Co.* v. *New Hampshire Ins. Group*, 124 N.H. 417, 418, 469 A.2d 1367 (1983) ("the mere explanation of bank services to a couple in a private office, cannot be considered advertising" [internal quotation marks omitted]).

and patronage"); and should include the "campaign" of monopolistic conduct that ultimately gave rise to the underlying antitrust action. We disagree. The *Bishop* complaint, phrased in terms of monopolistic and anticompetitive conduct, never mentions the word "advertising," nor is there any evidence that the alleged anticompetitive conduct was facilitated by a widespread advertising campaign by QSP and Reader's Digest against the *Bishop* plaintiffs. To the contrary, there is little evidence in the record that even suggests that a derogatory advertising campaign was launched by QSP and Reader's Digest against their competitors in the magazine fund-raising market. QSP and Reader's Digest seem to be relying on catchphrases from their own complaint, such as " 'scheme' to obtain monopoly power," and "advertising . . . the Reader's Digest name," to sustain an argument that they launched a campaign of anticompetitive and disparaging conduct that would be covered under the auspice of advertising injury.[21] There is nothing in the record that suggests that the alleged defamatory or disparaging conduct would have taken place in connection with advertising against anyone other than competitors in the magazine fund-raising market. More importantly, there is nothing in the *Bishop* complaint that warrants a charge of advertising injury in the first place. Thus, because there was no public dissemination of defamatory or disparaging materials, there can be no causal connection between the advertising by QSP and Reader's Digest and the injuries alleged by the *Bishop* plaintiffs.

---

[21] In their reply brief, QSP and Reader's Digest argue that the *Bishop* plaintiffs alleged that, by way of a "national sales force," QSP and Reader's Digest launched a " 'campaign' of anticompetitive conduct" by promoting their services, through brochures, booklets, price quotes, promotional prizes, solicitation by a national sales force and other communications with customers and potential customers.

## B

QSP and Reader's Digest also argue that there is coverage under the "advertising offense" provision of the GenStar and Federal policies because the *Bishop* complaint stated a cause of action for common-law "unfair competition."[22] GenStar's policy language defines "advertising offense" to include "*unfair competition*"; (emphasis added); and states that GenStar will "defend any suit against the Insured seeking damages on account of [unfair competition] . . . committed or alleged to have been committed in any advertisement, publicity article, broadcast or telecast and arising out of the Named Insured's advertising activities."[23] In order to trigger coverage for "unfair competition," the policies require that the underlying action allege not only the offense itself, but also that it arose out of the insured's advertising activities.

"[T]he policy imposes two requirements for coverage of an advertising injury, even when a specified offense . . . is involved. First, that [the] injury must have been one arising out of the offense in order to qualify under the definition of advertising injury. Second, *it must have been caused by an offense committed in the course of advertising [the insured's] goods.*" (Internal quotation marks omitted.) *Julian* v. *Liberty Mutual Ins. Co.,* 43

---

[22] As the trial court pointed out, this appeal does not raise any issues with respect to conduct prohibited by unfair business practice statutes. See, e.g., General Statutes § 42-110a et seq.; N.Y. Gen. Bus. Law § 349 et seq. (McKinney 1988). Thus, our analysis regarding unfair competition is based strictly on common-law theories.

[23] Under the GenStar umbrella policy, the language of which was adopted by Federal in its excess policy coverage, "[t]he Company will indemnify the Insured for all sums which the Insured shall become legally obligated to pay as damages . . . on account of . . . Personal Injury . . . [or] Advertising Offense to which this policy applies, caused by an occurrence." The policy defines an " '[o]ccurrence,' " in terms of " 'advertising offense' " and " 'personal injury,' " as "an offense described [under the previous definitions] which results in injury or damages . . . *neither expected nor intended from the standpoint of the Insured.*" (Emphasis added.)

Conn. App. 281, 289–90, 682 A.2d 611 (1996); see also *Bank of the West* v. *Superior Court*, 2 Cal. 4th 1254, 1277, 833 P.2d 545, 10 Cal. Rptr. 2d 538 (1992). The Appellate Court "construe[d] [the advertising injury] provision to mean that a covered advertising injury would have to be causally related to an offense . . . that is itself causally related to the insured's advertising activities." *Julian* v. *Liberty Mutual Ins. Co.*, supra, 290, and cases cited therein.[24] Courts require more than a tenuous connection between advertising and the claimed injury in order to trigger advertising injury coverage. See, e.g., *Simply Fresh Fruit, Inc.* v. *Continental Ins. Co.*, 84 F.3d 1105, 1108–1109 (9th Cir. 1996) (where patent infringement is independent of advertising there can be no causal connection between advertising and claimed infringement injuries); *Pacific Group* v. *First State Ins. Co.*, 70 F.3d 524, 527–28 (9th Cir. 1995) (not sufficient for coverage when there is unfair competition and also advertising unless nexus between two caused injury). Instead, "the injury for which coverage is sought must be caused by the advertising itself." *Microtec Research, Inc.* v. *Nationwide Mutual Ins. Co.*, 40 F.3d 968, 971 (9th Cir. 1994).

---

[24] In *Julian* v. *Liberty Mutual Ins. Co.*, supra, 43 Conn. App. 291, the Appellate Court held that there was no duty to defend an underlying patent infringement action, even where the "advertising injury" language of the policy covered, among other things, " 'infringement of copyright title or slogan' "; id., 283; " 'committed in the course of advertising.' " Id. The Appellate Court found not only that patent infringement did not fit within the definition of advertising injury, but also that, even if it did fit within the definition, it was not committed in the plaintiff's course of advertising its goods, products or services. In *Julian*, there was no reference connecting the underlying offense to the plaintiff insured's advertising activities. Therefore, the court held that "[b]ecause direct infringement involves the making, using, or selling of the patented invention, the infringement does not occur in the course of the insured's advertising activities. . . . Most courts have rejected the proposition that sales of an infringing product advertised by the insured establish a causal relationship between the advertisements and the infringement." (Citations omitted; internal quotation marks omitted.) Id., 291–92.

Paragraphs 29 (f), (g), (h) and (i) of the *Bishop* complaint allege that QSP and Reader's Digest "predatorily and discriminatorily *undercut competitive offerings,*" "engaged in predatory pricing," "intentionally interfered with the actual or prospective contractual or other business arrangements *of their competitors,*" and "engaged in various unfair and misleading business practices, including . . . making false and deceitful misrepresentations" as to the nature of their organization and activities. (Emphasis added.) QSP and Reader's Digest claim that these underlying allegations of unfair competition bring the *Bishop* complaint within the "advertising offense" provision of the GenStar policy. The trial court concluded, however, that the *Bishop* complaint "did not allege a . . . cause of action for unfair competition because it neither alleged the misappropriation of a commercial advantage belonging to the *Bishop* plaintiffs, nor [did it allege] that the *Bishop* plaintiffs suffered competitive injury." We agree with the trial court.

QSP and Reader's Digest argue that Connecticut construes the term "unfair competition" as a " 'generic name for a number of . . . torts involving improper interference with business prospects.' " *Larsen Chelsey Realty Co.* v. *Larsen,* 232 Conn. 480, 527 n.23, 656 A.2d 1009 (1995).[25] "The essence of a claim for unfair competition under New York law is that a party misappropriate the skill, expenditures and labor of another." *Crimpers Promotions, Inc.* v. *Home Box Office, Inc.,* 554 F. Sup. 838, 849 (S.D.N.Y. 1982), aff'd, 724 F.2d 290 (2d Cir. 1983), cert. denied, 467 U.S. 1252, 104 S. Ct. 3536, 82 L. Ed. 2d 841 (1984); see also *Ruder & Finn, Inc.* v. *Seaboard Surety Co.,* supra, 52 N.Y.2d 663. Although

---

[25] "Unfair competition" originally was used to describe the "passing off" or "palming off" of one's goods as those of another. See *Southland Sod Farms* v. *Stover Seed Co.,* 108 F.3d 1134, 1147 (9th Cir. 1997); *Bank of the West* v. *Superior Court,* supra, 2 Cal. 4th 1263.

Connecticut has not addressed the issue, New York does not require direct competition between a plaintiff and a defendant in order to sustain a cause of action for common-law unfair competition. See *Berni* v. *International Gourmet Restaurants of America*, 838 F.2d 642, 648 (2d Cir. 1988), citing *Metropolitan Opera Assn., Inc.* v. *Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 795–96, 101 N.Y.S.2d 483 (1950), aff'd, 279 App. Div. 632, 107 N.Y.S.2d 795 (1951). "At a minimum, however, the law is meant to protect property rights of commercial value and a plaintiff must establish such rights as a prerequisite to relief." (Internal quotation marks omitted.) *Berni* v. *International Gourmet Restaurants of America*, supra, 648. In order for a plaintiff to sustain a cause of action for unfair competition, there must be some evidence in the record that the defendant misappropriated a commercial or business advantage. See *Ruder & Finn, Inc.* v. *Seaboard Surety Co.*, supra, 671 ("misappropriation of another's commercial advantage [is] . . . cornerstone of the tort" of unfair competition, which should not "be equated with the far more amorphous term 'commercial unfairness' "); *Roy Export Co.* v. *Columbia Broadcasting System, Inc.*, 672 F.2d 1095, 1105 (2d Cir.), cert. denied, 495 U.S. 826, 103 S. Ct. 60, 74 L. Ed. 2d 63 (1982) (tort of unfair competition "broadly described as encompassing 'any form of commercial immorality' " but requires " 'misappropriat[ion] for the commercial advantage of one person . . . a benefit or "property" right belonging to another' "); *Perfect Fit Industries, Inc.* v. *Acme Quilting Co.*, 618 F.2d 950, 953–54 (2d Cir. 1980), cert. denied, 459 U.S. 832, 103 S. Ct. 73, 74 L. Ed. 2d 71 (1982) (same); cf. *Golden Nugget, Inc.* v. *American Stock Exchange, Inc.*, 828 F.2d 586, 591 (9th Cir. 1987) (no claim for unfair competition where plaintiff cannot show misappropriation of legitimate property interest). In this case, the *Bishop* plaintiffs were not being deprived of a commercial business

advantage, nor did they allege such a claim in their complaint.

We acknowledge that we have interpreted the phrase "unfair competition" broadly in certain contexts. In the context of advertising injuries, however, we agree with the decision in *Granite State Ins. Co.* v. *Aamco Transmissions, Inc.*, 57 F.3d 316, 320 (3d Cir. 1995), where the Court of Appeals for the Third Circuit opined that "the Supreme Court of Pennsylvania would hold that a competitor of the insured, but not its customer, can assert a claim which may be covered under the 'unfair competition' category of . . . 'advertising injury' coverage." We agree with this reasoning and find that "the word 'competition' as used in 'unfair competition' limits coverage to claims by competitors of the insured." Id. "[R]egardless of the nature of the insured's conduct, a claim by a consumer of its products or services arising from that conduct hardly can be characterized as a claim for unfair competition. After all, 'competition' connotes an insured's relationship with other persons or entities supplying similar goods or services." Id., 319.

QSP and Reader's Digest argue that the *Bishop* complaint states a cause of action for improper interference with business practices, analogous to unfair competition under the broad *Larsen Chelsey Realty Co.* standard, thereby warranting coverage as an "advertising injury." GenStar argues that QSP and Reader's Digest are manufacturing coverage by injecting into their briefs phrases like " 'wrongfully competed' " or " 'unfair competitive practices,' " which did not appear in the underlying action. We conclude not only that there was no claim of unfair competition raised in the *Bishop* complaint, but also that, even if there were such a claim, there would have been no plausible nexus between it and the insureds' advertising activity. We conclude that there was nothing in the record to show that QSP and Reader's Digest improperly interfered with anyone's

business or property, or that they did so through advertising. Emphasizing our original personal injury analysis, we therefore conclude that the *Bishop* plaintiffs made no allegations of advertising offenses, or unfair competition arising therefrom, that would trigger advertising injury coverage.

### III

### "ARISING OUT OF"

QSP and Reader's Digest also argue that the trial court improperly concluded that the defendants had no duty to defend because: (1) the *Bishop* plaintiffs' injuries did not arise out of covered torts, but rather arose out of the existence of a monopoly; and (2) there was no coverage where the underlying action alleged only consequential damages by parties not directly injured by the covered torts. QSP and Reader's Digest assert that even though the *Bishop* plaintiffs' claimed injuries were indirect, they arose out of the torts of defamation, disparagement, malicious prosecution and unfair competition, all of which are covered by the defendants' policies. They assert, therefore, that coverage is triggered as a result of the consequential damages arising out of those offenses alleged by the *Bishop* plaintiffs in the underlying complaint. The defendants, on the other hand, assert that the "arising out of" language in an insurance policy refers to the injury suffered and cannot be used to expand the list of enumerated offenses or broaden coverage to include even those remote injuries suffered by a tenuously connected plaintiff. We agree with the defendants.

The relevant policy language covers "personal injury" and "advertising injury" *arising out of* defamation, disparagement, malicious prosecution or unfair competition.[26] The trial court recognized that the term "arising

---

[26] Any "advertising injury" or "advertising offense" must *arise out of* an enumerated tort and be committed in the course of advertising.

out of" is very broad, and that it is the phrase that provides the causal connection between the injury and the offense in both the American Motorists and GenStar policies. "[I]t is generally understood that for liability for an accident or an injury to be said to 'arise out of' [an occurrence or offense], it is sufficient to show only that the accident or injury 'was connected with,' 'had its origins in,' 'grew out of,' 'flowed from,' or 'was incident to' [that occurrence or offense], in order to meet the requirement that there be a causal relationship between the accident or injury and [that occurrence or offense]." *Hogle* v. *Hogle*, 167 Conn. 572, 577, 356 A.2d 172 (1975), and cases cited therein. To "arise" out of means "to originate from a specified source." Webster's Third New International Dictionary (1961); see also Black's Law Dictionary (7th Ed. 1999) (defining "arise" as "1. [t]o originate; to stem [from] . . . 2. [t]o result [from]"). "The phrase arising out of is usually interpreted as indicat[ing] a causal connection." (Internal quotation marks omitted.) *Coregis Ins. Co.* v. *American Health Foundation*, United States Court of Appeals, Docket No. 99-9300 (2d Cir. February 14, 2001); see also *McGinniss* v. *Employers Reinsurance Corp.*, 648 F. Sup. 1263, 1267 (S.D.N.Y. 1986). Simply because we recognize, however, the breadth of the term "arising out of" and often interpret coverage ambiguities in favor of the insured does not mean that we will "obligate an insurer to extend coverage based . . . [upon] a reading of the complaint that is . . . conceivable but tortured and unreasonable." *New York* v. *AMRO Realty Corp.*, 936 F.2d 1420, 1428 (2d Cir. 1991).

In the first paragraph of their complaint, the *Bishop* plaintiffs described their class action as one seeking "Damages and Injunctive Relief Based on Violation of Federal Antitrust Laws" through the "monopolization of trade or commerce in the sale of magazine fund raising plans . . . in violation of Section 2 of the Sher-

man [Antitrust] Act (15 U.S.C. § 2)" by QSP and Reader's Digest. Paragraph 29 outlines the monopolistic conduct QSP and Reader's Digest allegedly committed *against their competitors*, which lead to the antitrust action, including the claims of defamation, disparagement, malicious prosecution and unfair competition. As this language suggests, and the preceding analysis concludes, none of these torts were committed against the *Bishop* plaintiffs.

The *Bishop* complaint also outlined the "anticompetitive effects intended by and resulting from the monopolistic practices" of QSP and Reader's Digest.[27] In their conclusion, the *Bishop* plaintiffs asserted that the antitrust violations, along with the "anticompetitive, predatory, and exclusionary acts" of QSP and Reader's Digest caused them to suffer injury in their business and property "because they have received lower percentages of magazine subscription revenues from QSP, and/or [have] paid more for promotional prizes, than would have been the case in a competitive marketplace."

It is plain, from a reading of the complaint, that the injuries alleged *arose out of* the existence of a monopoly in the school fund-raising market, and not out of the torts of defamation, disparagement, malicious prosecution or unfair competition. As the trial court pointed out, the damages claimed by the *Bishop* plaintiffs are inextricably connected to the loss of profits they suffered as a result of the monopoly created by QSP and

---

[27] Those effects include: (1) the denial to schools and youth groups of the benefits of competition in a free and open market; (2) the payment by schools and youth groups of artificially high prices for QSP's magazine fund-raising program, forcing those groups to accept reduced profit rates and pay excessive prices for promotional prizes and fund-raising services provided by QSP; (3) the deprivation of millions of dollars of proceeds to schools and youth groups, forcing them to cut important educational and extracurricular activities; and (4) the enjoyment, by QSP and Reader's Digest, of monopolistic profits to the detriment of their competitors and the school related entities and youth groups forming the class of *Bishop* plaintiffs.

Reader's Digest. See *Lazzara Oil Co.* v. *Columbia Casualty Co.*, 683 F. Sup. 777, 780 (M.D. Fla. 1988). To avoid this conclusion, QSP and Reader's Digest appear to rely on the general concept that where "an allegation of the complaint falls even possibly within the coverage, then the insurance company must defend the insured." (Internal quotation marks omitted.) *Community Action for Greater Middlesex County, Inc.* v. *American Alliance Ins. Co.*, 254 Conn. 387, 399, 757 A.2d 1074 (2000), quoting *Moore* v. *Continental Casualty Co.*, supra, 252 Conn. 409; *Fitzpatrick* v. *American Honda Motor Co.*, supra, 78 N.Y.2d 61 (insurer must defend claim whenever complaint suggests reasonable possibility of coverage despite merits of action). QSP and Reader's Digest also rely on those cases that hold that the duty to defend does not hinge on the skill or manner in which a complaint is drafted; see, e.g., *Andover* v. *Hartford Accident & Indemnity Co.*, 153 Conn. 439, 443–44, 217 A.2d 60 (1966); but rests on the substantive thrust of the complaint and the surrounding facts. However, "[t]he language [of the policies] in no way can be interpreted to extend coverage to other torts, not specifically enumerated, which bear [only] some similarity to those listed in the policy." *Wake Stone Corp.* v. *Aetna Casualty & Surety Co.*, 995 F. Sup. 612, 617 (E.D.N.C. 1998). Therefore, although we adhere to "broad interpretation" standards in construing insurance policies, we conclude that the allegations in the *Bishop* complaint do not fall "even possibly within the coverage"; *Moore* v. *Continental Casualty Co.*, supra, 409; of the defendants' policies because the *Bishop* plaintiffs' damages resulted from antitrust violations, rather than the indeterminately pleaded common-law torts that serve solely as factual background in the underlying complaint.

QSP and Reader's Digest argue that "insurers . . . have a duty to defend their insureds against antitrust suits that also allege other common law business torts

[e.g., commercial disparagement] where the insurer has issued a general liability insurance policy." *Tews Funeral Home, Inc.* v. *Ohio Casualty Ins. Co.*, 832 F.2d 1037, 1043 (7th Cir. 1987), and cases cited therein. Although we do not disagree with this proposition, we conclude nonetheless that in order for covered common-law torts to trigger coverage, those torts and their resultant injuries must have been alleged by the proper plaintiffs. The proper plaintiffs are those individuals who can prove direct injury as a result of defamation, disparagement and the like. For example, in *Tews Funeral Home, Inc.*, the plaintiff was one of thirty-seven other defendants in a nine count antitrust damages action brought in federal court in Illinois entitled *Cedar Park Funeral Home* v. *Illinois Funeral Directors' Assn.*, Docket No. 85 C 2137. In *Cedar Park Funeral Home*, "Tews and the other named defendants [were] accused of conspiring to make 'false, misleading and defamatory' statements 'disparaging' the Cedar Park plaintiffs' [funeral] services and products 'with the expressed interest of discouraging' consumers from buying the Cedar Park plaintiffs' products and services." *Tews Funeral Home, Inc.* v. *Ohio Casualty Ins. Co.*, supra, 1040. Tews sued the defendant, Ohio Casualty Insurance Company, to determine its rights to defense and indemnification for costs arising out of the antitrust action after a dispute arose regarding coverage. The Seventh Circuit Court of Appeals, adopting the trial court opinion, found that the insurance company did have a duty to defend where "the federal suit 'painted a picture which, had it been established, conceivably could have subjected [the] defendant's insured . . . to liability for commercial disparagement.' " Id., 1043, quoting *Ruder & Finn, Inc.* v. *Seaboard Casualty Co.*, supra, 52 N.Y.2d 672.

*Tews Funeral Home, Inc.*, is distinguishable from the present case, however, because the plaintiffs in the

underlying action in that case were the direct targets of the commercial disparagement. In this case, on the other hand, the *Bishop* plaintiffs cannot argue that they suffered from commercial disparagement when it was not their goods or services that were being disparaged. The damages they suffered were economic damages arising out of the monopoly allegedly created by the commercial disparagement of the competitors of QSP and Reader's Digest. The connection between the covered offenses and the resultant injury is far too tenuous to trigger coverage under the policies.

In *Springdale Donuts, Inc.* v. *Aetna Casualty & Surety Co. of Illinois*, supra, 247 Conn. 806–807, for example, we declined to impose a duty to defend under a workers' compensation and employer's liability policy where the plaintiffs in the underlying action claimed injuries for slander and invasion of privacy arising out of sexual harassment and discrimination in the workplace.[28] The plaintiff sought coverage, in part, from Farmington Casualty Company for the claims that had been brought against it in the underlying action by arguing that the workers' compensation policy language was ambiguous. We concluded, however, that the policy "[v]iewed in its entirety . . . unequivocally indicate[d] that [it] was intended to provide coverage only for claims for worker's compensation benefits." Id., 809. The plaintiffs in the underlying action had not gone through the workers' compensation commission, nor did they state any claim for workers' compensation benefits. Therefore, where the plaintiff was not making

---

[28] The plaintiff also sought coverage under a comprehensive general liability policy and an excess policy, arguing that the allegations of slander and invasion of privacy brought the underlying action within the policy coverage. We concluded that there was no coverage under those two policies because the claims were for "mental injuries" that were specifically excluded. *Springdale Donuts, Inc.* v. *Aetna Casualty & Surety Co. of Illinois*, supra, 247 Conn. 813–14.

a claim for benefits paid pursuant to workers' compensation law, there was no coverage under the policies. Id.

The defendants in this case cite *Wake Stone Corp.* v. *Aetna Casualty & Surety Co.*, supra, 995 F. Sup. 617, to support their argument that "[t]he 'arising out of' language . . . refers to the injury, not to the offense" alleged in the underlying complaint and that the "broad construction [of the phrase 'arising out of' applies to] . . . causation, not interpretation of the covered offenses." In that case, the plaintiff, Wake Stone Corporation, argued that there was a duty to defend under its "personal injury" coverage for an underlying action brought by a competitor, Martin Marietta Corporation, for unfair trade practices. The personal injury coverage at issue, however, covered injuries arising out of libel and slander, but did not list unfair competition or unfair trade practices among the covered torts. Refusing to impose a duty to defend on the insurer, the court held that where coverage for libel or slander did not include coverage for unfair trade practices, it could not be extended to any tort simply because "a claim may arise out of the same facts as the [covered offense]. . . . Otherwise, the enumeration in the policy of covered offenses would be purposeless." Id. We agree with this reasoning.

QSP and Reader's Digest, on the other hand, rely on several cases to support their argument that the *Bishop* plaintiffs did not have to suffer direct injury in order to trigger a duty to defend. See *Izzo* v. *Colonial Penn Ins. Co.*, supra, 203 Conn. 305; see also *Burroughs Wellcome* v. *Commercial Union Ins. Co.*, 632 F. Sup. 1213 (S.D.N.Y. 1986); *Charles F. Evans Co.* v. *Zurich Ins. Co.*, 95 N.Y.2d 779, 731 N.E.2d 1109, 710 N.Y.S.2d 301 (2000). As the trial court pointed out, these cases are easily distinguishable. In *Izzo*, the husband of a woman injured in an automobile accident sought coverage under a $300,000 " 'per occurrence' " limit of bodily

injury coverage for loss of consortium, after his wife recovered $100,000 under the " 'per person' " limit of coverage. *Izzo* v. *Colonial Penn Ins. Co.*, supra, 308–309. Denying recovery for the husband, we concluded that it was the wife who could not perform the spousal functions who suffered the bodily injury, not the husband claiming a resultant loss of consortium. Id., 312. Even though we considered the loss of consortium a separate cause of action, we held that it was "derivative and inextricably attached to the claim of the injured spouse." Id. The couple, therefore was limited to the " 'per person' " coverage. QSP and Reader's Digest claim that this language supports their argument that courts recognize policy coverage even in cases where the injury is suffered indirectly, as long as that indirect injury is derivative and inextricably connected to the direct injury. *Izzo*, however, dealt with bodily injury coverage, and followed the well settled principle that "damages for loss of consortium . . . are subject to 'per person' limitation." Id., 310, and cases cited therein. Furthermore, *Izzo* was dealing with the unique relationship between husband and wife. Its holding, therefore, is inapposite for purposes of our analysis in this case.

The reliance by QSP and Reader's Digest on *Burroughs Wellcome* and *Charles F. Evans Co.* is similarly misplaced. In *Burroughs Wellcome* v. *Commercial Union Ins. Co.*, supra, 632 F. Sup. 1215, the court found a duty to defend derivative claims brought by the spouses and grandchildren of women who had taken DES, a harmful prenatal drug prescribed from the 1940s to the 1960s to prevent miscarriages. The issue in that case, however, was whether the injuries claimed by these individuals had become apparent or had manifested themselves before termination of coverage, not whether the injuries were proximately caused by the

claimants' exposure to DES.[29] Again, as the trial court pointed out, the analysis has no bearing on this case.

In *Charles F. Evans Co.* v. *Zurich Ins. Co.*, supra, 95 N.Y.2d 779, the plaintiff was a construction subcontractor who installed skylights in the building of a local company. Because of faulty installation, the area around the skylights leaked, causing the floor underneath them to become wet and slippery. Employees of the company occupying the building suffered "slip and fall" injuries for which their employer brought an action. In that underlying action the employer alleged that, owing to the leaking roof, his employees " 'slipped and fell in puddles . . . and were injured,' " and his company was " 'forced to incur expenses, in the form of lost-time and workers' compensation claims . . . .' " Id., 780. The Court of Appeals held that the defendant insurance company had a duty to defend the employer's underlying action because the bodily injury coverage in the plaintiff's policy covered " 'those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" ' "; id.; which the court found "at least ambiguous" with respect to whether the claims in the employer's action were covered. Id. Thus, although the plaintiff employer in the underlying action did not suffer direct bodily injury, the ambiguity in the policy was interpreted in favor of the insured. Unlike the policy in *Charles F. Evans Co.*, the policies at issue in this case do not suffer from any ambiguities. The *Bishop* complaint simply does not allege damages suffered as the result of any covered offense.

The term "arising out of" requires that we look at the injuries sustained by the *Bishop* plaintiffs, rather than the underlying offenses that QSP and Reader's Digest claim caused those injuries. As stated previously,

---

[29] It is also easier to imagine that individuals in this type of situation could claim a direct injury as a result of their exposure to DES.

the *Bishop* plaintiffs' injuries did not arise out of the covered offenses of defamation, disparagement, malicious prosecution or unfair competition, because the schools and youth groups making up the class of plaintiffs were not the parties injured by those offenses. The injuries alleged in the *Bishop* action were economic injuries that arose out of the monopolization of the magazine fund-raising market by QSP and Reader's Digest. We conclude that because there was no causal relationship between the *Bishop* plaintiffs' injuries and the torts that QSP and Reader's Digest claim caused those injuries, there is no duty to defend.

## IV

## DUTY TO INDEMNIFY

The final contention of QSP and Reader's Digest is that the trial court improperly concluded, as a result of the aforementioned determinations, that the defendants had no duty to indemnify the plaintiffs for the *Bishop* settlement. We disagree. As we previously have held, where there is no duty to defend, there is no duty to indemnify, given the fact that the duty to defend is broader than the duty to indemnify. See *Heyman Associates No. 1* v. *Ins. Co. of Pennsylavnia*, 231 Conn. 756, 798, 653 A.2d 122 (1995); see also *Nationwide Ins.* v. *Zavalis*, 52 F.3d 689, 693 (7th Cir. 1995).

The judgment is affirmed.

In this opinion the other justices concurred.