Phillip INKEL, Merideth Labella, Phillip Inkel II, Nicholas Inkel, Jessica Inkel, Aaron Baker, Abigail Baker, Alexander Inkel, Andrew Inkel, and Anastasia Inkel, Plaintiffs,

v.

CONNECTICUT DEPARTMENT OF CHILDREN AND FAMILIES, Connecticut Department of Social Services, Darlene Dunbar, Patricia Wilson–Coker, Kristine Ragaglia, Susan Wax, Jean Corsini, Colleen Lenney, Jo–El Suroviak, Deborah Barber, Randall Snow, Torrence Jennings, Gerald Hetu, Lisa Pisani, and Connecticut Chief Court Administrator Joseph Pellegrino, Defendants.

No. 3:04CV69 (JBA).

United States District Court,
D. Connecticut.

March 17, 2006.

Phillip Inkel, East Haddam, CT, Pro se.

Meredith Labella, East Haddam, CT, Pro se.

Robert William Clark, M.J. McCarthy, Attorney General's Office, Hartford, CT, for Defendants.

### RULING AND ORDER [DOCS. ## 50, 80, 92, 93, 102]

ARTERTON, District Judge.

*Pro se* plaintiffs Phillip Inkel and Meredith LaBella bring this action on behalf of themselves and their eight minor children, alleging violations of their constitutional rights in connection with certain state child welfare proceedings and investigations and actions by the Connecticut Department of Children and Families ("D.C.F.") and Department of Social Services ("D.S.S.") relating to those proceedings. Defendants, the Commissioners of D.C.F. and D.S.S. and D.C.F. employees, have moved to dismiss the complaint, and, for the reasons that follow, their motions will be granted.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs' original complaint was filed *in forma pauperis* in January 2004. On October 19, 2004, this Court issued a ruling pursuant to 28 U.S.C. § 1915(e)(2)(B), [Doc. # 30], dismissing some of the claims and defendants. Plaintiffs were instructed to file an amended complaint and serve the remaining defendants. The Amended Complaint was filed January 12, 2005 [Doc. # 54], and service on the original defen-

dants as well as some additional defendants appears to have been completed in June 2005. The majority of the defendants moved to dismiss the complaint under Rules 12(b)(1) and 12(b)(6), [Docs. ## 93–94], and then Patricia Wilson–Coker, the Commissioner of D.S.S., subsequently moved to dismiss on the same grounds. [Docs. ## 102–103]. Plaintiffs then filed an objection to the motion to dismiss. [Doc. # 104].

Plaintiffs' Amended Complaint ("Compl.") alleges the following facts, which will be accepted as true for the purpose of ruling on the motions to dismiss. On March 10, 1999, defendants Wax and Barber, employees of D.C.F., acting on allegedly false information from a witness named Timothy Baker that Phillip Inkel assaulted Aaron Baker, interviewed Meredith LaBella and threatened her that if she did not force Phillip Inkel to move out of the family home, D.C.F. would take custody of her children. Compl. ¶¶ 2–4. Since then, "D.C.F. Ragaglia, Wax and Barber made good on their threats ... D.C.F. has repetively [sic] created false reports, false petitions, have initiated malicious prosecutions, gained wrongful judicial orders, miscarriages of justice, have assaulted the family, broken into the family's homes on multiple occasions, s[ei]zed their children, abused the children while in D.C.F. custody, neglected the children and have acquired false medical diagnos[e]s and false medical treatment plans without due process of law." *Id.* ¶ 5. Plaintiffs allege that in April 1999 defendants Wax and Snow filed false affidavits and reports in Connecticut juvenile court in an attempt to put plaintiffs Aaron and Abigail Baker in D.C.F. custody. *Id.* ¶ 7.

### A. Allegations concerning Aaron Baker

During the 2001–2002 school year, LaBella alleges she attempted to obtain D.C.F's help to pay for necessary mental health counseling for plaintiff Aaron Baker, but D.C.F. officials refused. *Id.* ¶¶ 16–17. On February 9, 2002, LaBella brought Aaron Baker to Connecticut Children's Medical Center after he threatened "to hurt family members and commit suicide," and the medical center referred him to the Institute of Living. *Id.* ¶ 18–19. The Institute of Living requested LaBella's permission to administer an anti-depressant medication to Aaron Baker, which she refused. *Id.* ¶¶ 20–21. Plaintiffs allege that defendants Ragaglia, Hetu, Lenney, and other D.C.F. personnel conspired with the Institute to "willfully misdiagnose Aaron Baker's mental health condition, not treat him, drug him in lieu of treatment, create false medical reports, false social service reports, and false child abuse and neglect reports and further conspired to intimidate and extort compliance and authorization from Meredith LaBella to" administer medications to Aaron Baker. *Id.* ¶ 22. These D.C.F. personnel further refused "voluntary placement" for Aaron Baker, and submitted "false petitions and affidavits" with the Superior Court for Juvenile Matters at Waterford, Connecticut, for an order of temporary custody for the child. *Id.* ¶¶ 24–25. LaBella alleges she was never served with an order to show cause concerning this matter, and that a state Marshall, not a party to this action, falsified a return of service. *Id.* ¶ 26. The order of temporary custody was granted on April 5, 2002, and on that date "D.C.F. abducted Aaron Baker from I.O.L. and placed him to a place unknown ...." *Id.* ¶ 27–28.

LaBella alleges she then contacted the office of former Governor Rowland, whose staff "directed D.S.S. and D.C.F. with the cooperation of the Connecticut Superior Court for Child Support enforcement to imprison and hold incommunica[d]o ... Phillip Inkel without any meaningful due process of law." *Id.* ¶ 32.

In connection with the Aaron Baker petition of April 2002, LaBella also alleges that the Connecticut Superior Court deprived her of her rights by failing to pay "court appointed attorneys enough money to effectively represent their clients." *Id.* ¶ 38. She also alleges that court-appointed attorneys are denied the opportunity for discovery and encouraged to violate attorney-client privilege and otherwise "extort compliance" from their clients. *Id.* On behalf of Aaron Baker, it is alleged that his appointed attorney, who is not a defendant in the present case, failed, and continues to fail, to represent his best interests in juvenile court. *Id.* ¶¶ 39–40. The parents make similar allegations about their own court-appointed attorneys from the family court proceedings. *See id.* ¶¶ 41–43, 67.

LaBella filed a petition for a writ of habeas corpus on behalf of Aaron Baker before the United States District Court, which was dismissed for lack of subject matter jurisdiction by The Hon. Dominic Squatrito in August 2002. *See LaBella v. Conn. Dept. of Children and Families*, 3:02cv712 (DJS), attached to Def. Mem. of Law [Doc. # 94] as Ex. A. Plaintiffs allege that, in retaliation for filing that federal lawsuit, defendants Wax, Corsini and Lenney instructed non-defendant state troopers to "unlawfully ente[r] the [family's] home, interrogat[e] the family and evic[t] the family from their home . . . and further caus[e] the theft and destruction of the family's possessions and necessities to survive." Compl. ¶ 35. LaBella alleges that these actions caused her to "flee" and "seek refuge at a shelter in the State of Vermont." *Id.* ¶ 36.

**B. Allegations concerning Anastasia Inkel, Alexander Inkel, Andrew Inkel, and Abigail Baker**

In November 2003, defendants Wax, Corsini and Lenney along with other non-

defendants from the Superior Court "conspired to kidnap and harm newborn infant Anastasia Inkel" when they took custody of her in the hospital. *Id.* ¶ 45, 49. At the same time, D.C.F. filed petitions for temporary custody for the other children who were at home, namely Anastasia Inkel, Alexander Inkel, Andrew Inkel and Abigail Baker. *Id.* ¶ 46. Plaintiffs allege "upon information and belief" that D.C.F. personnel forged a judge's signature on the order granting D.C.F. temporary custody of these children, and filed other false or forged documents in connection with these proceedings. *Id.* ¶¶ 47–49. Plaintiffs further allege:

> While at William W. Backus Hospital on November 2, 3002 at or around lunchtime D.C.F. agent Jean Corsini approached Meredith LaBella in the maternity section of the nursery while she was breastfeeding Anastasia and threatened to put Meredith LaBella and Phillip Inkel in jail if Meredith LaBella did not disclose the whereabouts of Phillip Inkel and all the other children. D.C.F. Jean Corsini also stated that she would be going to court that day and going [sic] to get custody of all Meredith LaBella's children and further stated that Meredith LaBella could not go to that court date and further stated "What do you think about that!"

*Id.* ¶ 54. LaBella then alleges that Defendant Jennings "interrogated" her without an attorney, despite her request for one. *Id.* ¶ 62.

On November 7, 2003, while Abigail Baker was residing with her grandmother, Janet LaBella, D.C.F. filed "another false ex-parte motion" to take custody of her on the basis that she had been abandoned by her mother. *Id.* ¶¶ 55–56.

Plaintiffs allege that defendant Suroviak "filed another false petition and accompa-

nying affidavits seeking orders of temporary custody on Anastasia, Alexander and Andrew Inkel" on October 7, 2004, on which date she "seized" the three children. *Id.* ¶¶ 64–65. The following week at a court hearing, defendant Suroviak "testified falsely about how she gained entry to the Inkel family home, the sequence of events that had occur[r]ed while in the home and conversations she had between herself and Meredith Labella." *Id.* ¶ 66. Defendant Lenney also allegedly gave false testimony concerning the existence of guns in the plaintiffs' home. *Id.* The adult and minor plaintiffs allege various deficiencies on the part of all their court-appointed attorneys during these proceedings. *Id.* ¶ 67–71.

Plaintiffs allege that the children have been abused and neglected in foster care. "Alexander Inkel has reported that as a form of punishment he is placed in a trash can and sealed in it with the lid closed. Both Andrew and Alexander Inkel report that they are frequently spanked and Andrew reports he is spanked for peeing in his pants." *Id.* ¶ 72. When the Inkels reported a bruise on Andrew's backside, D.C.F. informed them that no such bruise was observed and the Inkels believe the foster mother deliberately misidentified Alexander as Andrew so that the wrong child was examined. *Id.* The Inkels also allege that the foster mother of Anastasia Inkel caused a diaper rash on the child "to build a case against the Inkel parents." *Id.* ¶ 73.

Plaintiffs allege that "while at a visit at the D.C.F. office in Norwich, Connecticut, Alexander Inkel was denied access to a bathroom by D.C.F. causing him to urinate in his pants. Alexander Inkel has been potty trained since age 2½ and has not had an accident in his pants until his removal from the Inkel parents' home. Alexander

now wears diapers where he has not worn diapers in over 1 ½ years." *Id.* ¶ 77.

LaBella also alleges that Andrew and Alexander Inkel and Abigail and Aaron Baker were coached by defendant Lenney and others to say "that their mother Meredith LaBella Inkel is mean and rude." *Id.* ¶ 75.

### C. Searches of Family's Home

Plaintiffs allege several unlawful searches of their various residences between 2002 and the present. First, as discussed above, in August 2002, certain defendants allegedly caused the police to enter plaintiffs' home, in connection with Aaron Baker's custody proceedings, and to cause property damage. *Id.* ¶ 35. In February 2003, plaintiffs allege another search occurred "under the direction of Darlene Dunbar, Susan Wax" and unnamed D.C.F. agents. *Id.* ¶ 57. Plaintiffs allege that the agents searched the property at 95 Stanavage Road, Colchester, "because they were very concerned about the Inkel children. On one such occasion [a state trooper] drew his pistol while searching for the Inkels just moments after he was ordered to leave the property for the fourth time that day." *Id.* ¶ 57. Also in February 2003, D.C.F. made disparaging remarks about the Inkels to a "mentally unstable" individual who lived at the same 95 Stanavage Road address, causing this individual to threaten Phillip Inkel's safety. *Id.* ¶ 59.

Plaintiffs also allege that "it is believed that D.C.F. told Timothy Baker," presumably the biological father of Aaron Baker, "a mentally unstable and violent person, that Phillip Inkel sexually assaulted Aaron Baker." *Id.* ¶ 61. This information allegedly caused Timothy Baker to threaten Phillip Inkel with a hammer and back his car into the Inkels' van, whereupon, in response to the sound of the car crash,

Meredith LaBella "ran down the stairs, slipped and fell" and hurt her ankle. *Id.*

In November 2003 another search by defendants Lenney and Corsini and unnamed state troopers resulted in plaintiffs' eviction from their home after defendants told their landlady that plaintiffs "are drug addicts and that Phillip Inkel had sexually abused Aaron Baker." *Id.* ¶ 56.

In May 2004 defendants Lenney and Suroviak and an unidentified state trooper went to the Inkel's new home "and demanded entry, without a warrant. . . ." *Id.* ¶ 63. The landlord refused, and the state trooper " speaking on behalf of himself and D.C.F. threatened [the landlord] that if entry was refused then the state trooper would come back with more state troopers and 'make this place look like Bagdad [sic].' " *Id.* The landlord then permitted a search of the Inkels' bedrooms. *Id.*

On October 5, 2004, defendant Suroviak, another D.C.F. agent and law enforcement agents went to the Inkels' home to conduct an evaluation that resulted in the commital of Alexander, Anastasia and Andrew Inkel to the custody of D.C.F., *id.* ¶ 64, but plaintiffs do not specify the circumstances they believe rendered this home visit unlawful.

#### D. Claims and Relief Sought

Plaintiffs allege that the various defendants have conspired to violate their civil rights, committed "larceny by defrauding the public," "racketeering," perjury, witness tampering, obstruction of justice, "misprisons of felonies," and have "kidnaped [sic]" the children. Compl. ¶ 78–82. They also allege that defendants "[Wilson-]Coker, Ragaglia, Dunbar and Chief Court Administrator Joseph Pel[l]igrino have caused, condoned, required, authorized, impliedly authorized the unlawful

conduct and constitutional deprivations described in this complaint by failing to train, monitor, supervise, discipline . . . and through direct participation, control and authorization of the described unlawful conduct." *Id.* ¶ 83.

Plaintiffs seek "an injunction against the defendants ordering them to opperate [sic] lawfully, effectively and consistent with the scope of their respective authorities" and ceasing "the unlawfull [sic] conduct described in the body of [the] complaint." They also seek compensatory and punitive damages, costs, and attorney fees.[1]

### II. STANDARD

In ruling on a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the pleader. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir. 1991). To survive the motion, the plaintiffs must set forth " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (quoting Fed.R.Civ.P. 8(a)(2)); *see also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99 (footnote omitted); *see also Jaghory v. N.Y. State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to

---

1. The Inkels are appearing *pro se.*

offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

## III. DISCUSSION

Defendants move to dismiss the various aspects of the complaint on a number of grounds, including failure to state a claim, sovereign immunity, quasi-prosecutorial immunity, witness immunity, statute of limitations, lack of personal involvement in the events alleged, and failure to serve certain defendants.

### A. Racketeering Claims

This Court previously held in its Ruling Pursuant to 28 U.S.C. § 1915(e)(2)(B), [Doc. # 30] at 9–10, that plaintiffs' complaint was insufficient to state a civil RICO claim. Plaintiffs' current complaint adds no new factual allegations that would support a claim of the existence of a racketeering enterprise or a pattern of racketeering activity, and therefore all claims for racketeering or racketeering conspiracy will be dismissed for the reasons stated in the Court's previous Ruling.

### B. Service on Defendants Hetu and Corsini

Despite several extensions of time to do so, plaintiffs have not served Defendant Hetu, and all claims against him therefore will be dismissed. The record contains no return of service for Defendant Corsini, but she has appeared through counsel in her official capacity. *See* Appearance [Doc. # 90]. Any claims against her in her individual capacity will be dismissed.

### C. Section 1983 Claims Arising Prior to 2001

As this Court held in its previous Ruling, the statute of limitation under 42 U.S.C. § 1983 is three years. *See* Ruling at 13. Thus any of plaintiffs' claims arising prior to January 15, 2001, three years before the initiation of this lawsuit, are time barred. Specifically, all claims relating to the actions of defendants Ragaglia, Wax, Barber and Snow arising from the March 1999 investigation concerning Aaron Baker are dismissed. Because the only claims against Barber and Snow stem from this incident, these two defendants must be dismissed from the case.

### D. Claims Against D.C.F. and D.S.S.

The Eleventh Amendment bars claims for injunctive or declaratory relief and damages against a State or an arm of a State, unless the State specifically waives or Congress abrogates its sovereign immunity. *See Cory v. White,* 457 U.S. 85, 90–91, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982); *Edelman v. Jordan,* 415 U.S. 651, 667–69, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana,* 134 U.S. 1, 10–11, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Mancuso v. N.Y. State Thruway Auth.,* 86 F.3d 289, 292 (2d Cir.1996); *Atlantic Healthcare Benefits Trust v. Googins,* 2 F.3d 1, 4 (2d Cir.1993). It cannot be disputed that the Connecticut Department of Children and Families and Department of Social Services are arms of the state. Plaintiffs have asserted no causes of action under which it could be found that the State has waived, or Congress has abrogated, its sovereign immunity. Therefore all claims against D.C.F. and D.S.S. as state agencies are dismissed.

### E. Claims of Harm by Third Parties

As defendants argue, any claims for damages arising out of actions by individuals who are not named as defendants must be dismissed. Thus, the claims involving law enforcement officers who participated

in searches of the Inkels' home will be dismissed. The allegations against individual D.C.F. workers, state court employees, marshalls, judges, and attorneys who are not named as defendants also must be dismissed. Any claims for harm due to the actions of Timothy Baker, the allegedly mentally unstable individual who attempted to assault Phillip Inkel and damaged his car, are likewise dismissed. Finally, any claims for harm perpetrated against the children by their foster parents will be dismissed, as those individuals are not named defendants.

### F. Damages Claims Against Judge Pellegrino

Plaintiffs have sued Judge Pellegrino, Chief Administrator of the Connecticut Courts, in his official and personal capacities. Reading the complaint in the light most favorable to plaintiffs, it appears that the only allegations against Judge Pellegrino stem from his supervisory role over several Superior Court judges who have ruled against the Inkel parents concerning various child protection matters. Plaintiffs thus appear to allege that Judge Pellegrino has failed to properly supervise these other judges and thereby has permitted these judges by their rulings to deprive the Inkels of their rights in the course of juvenile court hearings. *See* Compl. ¶ 82–83.

■ "Judges enjoy absolute immunity from personal liability for 'acts committed within their judicial jurisdiction.'" *Young v. Selsky*, 41 F.3d 47, 51 (2d Cir.1994) (quoting *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)); *see also* Ruling [Doc. # 30] at 20.[2] Plaintiffs' claims for damages against Judge Pellegrino, which are addressed to the substance of family court rulings issued by other judges, must be dismissed because they are within "judicial jurisdiction."

### G. Damages Claims Arising from False Testimony

Plaintiffs claim that the orders of temporary custody that were entered for Aaron Baker (April 2002), Abigail Baker (November 2003), and Anastasia, Alexander, and Andrew Inkel (October 2004), were obtained by fraud and false testimony presented by D.C.F. employees and accepted and condoned by defendants Pellegrino and Pisani, a deputy clerk for the Connecticut Superior Court for Juvenile Matters at Waterford. Defendants argue that claims arising out of false testimony or false affidavits are barred by the *Rooker–Feldman* doctrine, and the Court agrees.

■ The *Rooker–Feldman* abstention doctrine holds that "federal district courts do not have jurisdiction over claims that have already been decided, or that are 'inextricably intertwined' with issues that have already been decided, by a state court." *Mitchell v. Fishbein*, 377 F.3d 157, 165 (2d Cir.2004) (quoting *Bridgewater Operating Corp. v. Feldstein*, 346 F.3d 27, 29 (2d Cir.2003) (per curiam)). *See generally District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416, 44 S.Ct. 149, 68 L.Ed. 362 (1923). Thus, the "Rooker–Feldman doctrine provides that the lower federal courts lack subject matter jurisdiction over a case if the exercise of jurisdiction over that case would result in the reversal or modification of a state court judgment." *Hachamovitch v. DeBuono*, 159 F.3d 687, 693 (2d Cir.1998). The doctrine "holds that, among federal courts, only the Supreme Court has sub-

**2.** There is no absolute judicial immunity from prospective injunctive relief. *Pulliam v. Allen*, 466 U.S. 522, 541–42, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984).

ject matter jurisdiction to review state court judgments." *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 185 (2d Cir.1999) (citations omitted).

■ Additionally, the doctrine "bars federal courts from considering claims that are inextricably intertwined with a prior state court determination." *Id.* at 185 (citations and internal quotation marks omitted). In the Rooker–Feldman doctrine, "the Supreme Court's use of 'inextricably intertwined' means, at a minimum, that where a federal plaintiff had an opportunity to litigate a claim in a state proceeding (as either the plaintiff or defendant in that proceeding), subsequent litigation of the claim will be barred under the Rooker–Feldman doctrine if it would be barred under the principles of preclusion." *Moccio v. N.Y. State Office of Court Admin.*, 95 F.3d 195, 199–200 (2d Cir.1996). Stated another way, a federal claim is "inextricably intertwined" with the state court judgment if the relief sought may be granted only on the federal court's finding that the state court determined the issues before it erroneously. *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 25, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (plurality op.); *Ashton v. Cafero*, 920 F.Supp. 35, 37 (D.Conn.1996).

■ "Rooker–Feldman applies not only to decisions of the highest state courts, but also to decisions of lower state courts." *Ashton*, 920 F.Supp. at 37 (citing *Port Auth. Police Benevolent Assoc. Inc. v. Port Auth. of N.Y. & N.J. Police Dep't*, 973 F.2d 169, 177 (3d Cir.1992)). It applies to "challenges to final *and* interlocutory state court decisions." *Id.* (emphasis added).

■ Here, plaintiffs' claims that D.C.F. personnel submitted false evidence and thereby obtained unwarranted orders of temporary custody over the children are "inextricably intertwined" with the juvenile court proceedings themselves. The state court judges who issued the custody orders evidently credited the information presented by D.C.F. Plaintiffs now ask this Court to second-guess the state courts' factual and credibility findings. Plaintiffs' remedy for an incorrect or unfair juvenile court decision is to appeal that decision to higher state courts, not to seek federal court intervention by way of a civil rights action. Therefore any claims brought under 42 U.S.C. § 1983 relating to the submission of false testimony or information to state court must be dismissed.

## H. Vexatious Litigation

■ Alternatively, to the extent that plaintiffs intend to assert a common-law tort claim for vexatious litigation by their allegations that D.C.F. workers submitted false evidence to the juvenile courts, this claim must fail on the merits. "In a malicious prosecution or vexatious litigation action, it is necessary to prove want of probable cause, malice and a termination of the suit in the plaintiffs' favor . . . . . It must . . . appear that the litigation claimed to be vexatious terminated in some way favorable to the defendant therein." *QSP, Inc. v. Aetna Cas. and Sur. Co.*, 256 Conn. 343, 361 773 A.2d 906, 918 (Conn.2001) (internal quotation marks, citations and alterations omitted).

■ Here, plaintiffs cannot show that any of the juvenile court proceedings terminated in their favor. Rather, in each proceeding, the state court found by a preponderance of the evidence that an order of temporary custody of the children was necessary and would be continued for some period of time. *see* Def. Mem. of Law at 16 & Ex. C, D. Although, as defendants indicate, *id.* at 16 & Ex. B, Anastasia, Alexander and Andrew were returned to their parents in May 2005, this decision was made on the basis of changed circumstances in the family home, and it did not

imply reversal of the initial determination that temporary D.C.F. custody was warranted in October 2004. Thus any tort claim for vexatious litigation must be dismissed.

## I. Claims for Damages Against Commissioners Ragaglia, Dunbar and Wilson–Coker

As defendants note, Kristine Ragaglia no longer is the Commissioner of D.C.F., Def. Mem. of Law [Doc. # 94] at 17, and therefore she no longer may be sued in her official capacity. Defendant Dunbar is the current Commissioner of D.C.F. and Defendant Wilson–Coker is the Commissioner of D.S.S. They are sued in their individual and official capacities.

Construing the complaint in a light most favorable to plaintiffs, their claim that "[Wilson-]Coker, Ragaglia, [and] Dunbar have caused, condoned, required, authorized, impliedly authorized the unlawful conduct and constitutional deprivations described in this complaint by failing to train, monitor, supervise, discipline" the other defendants, Compl. ¶ 83, will be read to allege a § 1983 claim for failing to properly train and supervise the caseworkers who were involved with the Inkel family.

The Commissioners argue that they were not personally involved in the harms allegedly caused to plaintiffs and therefore all claims against them must be dismissed. However, as the Second Circuit has held,

A defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983 in several ways. The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

*Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (internal citations omitted). Therefore the fact that the Commissioners were not personally involved in decisions concerning the placement of the Inkel children is not dispositive. Construing the complaint in plaintiffs' favor, they also allege that these defendants failed to adequately train and supervise the caseworker defendants and created a policy or custom in which caseworkers would routinely falsify court records, testimony, and other documents, and enter homes without proper authorization.

The Second Circuit has established a three-prong test for determining whether an official is liable for failing to train or supervise his or her employees. The plaintiff must show that: (1) "a policymaker knows 'to a moral certainty' that her employees will confront a given situation;" (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation;" and (3) "the wrong choice by [an] employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992) (internal citations omitted). Fourth, the plaintiff must show that the alleged failure to train or supervise caused the plaintiff's injury. *Id.* at 298.

Here, reading the complaint in the light most favorable to plaintiffs, it can be assumed that they have made out the first three elements. They have alleged facts from which it can be inferred that D.C.F. and D.S.S. knew that their workers would

confront situations in which child abuse or neglect has been alleged and they are put in a position of investigating the allegations and presenting the results of those investigations to the juvenile court. Second, the determination of whether a child is at risk in his or her current living situation or placement could present a difficult decision or choice of whether D.C.F. should seek an order of temporary custody or attempt to remedy any child protection concerns in some less drastic way. Third, an erroneous decision carries with it a likelihood that the parents of a child who is placed involuntarily with D.C.F. could be deprived of constitutional rights. *See Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) ("[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court.").

■ However, plaintiffs have not alleged facts from which it could be inferred that any failure of training or supervision on the part of these defendants *caused* plaintiffs' alleged injuries. Plaintiffs state that D.C.F. workers submitted "false" information to the courts, but they do not specify the content of this "false" information. The complaint makes no allegation that the minor plaintiffs were not abandoned, neglected or abused by the parents and states that the juvenile courts upheld the orders of temporary custody. The Hon. Carl E. Taylor of the Child Protection Session at Middletown, Connecticut, issued a decision after a full trial on the merits held in October 2004, upholding the orders of temporary custody for Alexander, Andrew and Anastasia on the grounds that a state trooper observed dangerous conditions—namely an unsecured, loaded shotgun and a knife as well as a gas camping stove—in locations in the Inkels' home where they could have harmed these three

children, who were ages 4, 33 months, and 11 months at the time. *See* Mem. of Decision, 12/15/04, Def. Ex. C. On January 21, 2003, Judge Driscoll issued a written decision after trial committing Aaron to D.C.F. custody "until further court order" due to Meredith LaBella's unwillingness to care for him at home on the terms recommended by the Institute of Living, and the fact that she visited him only once in the nine months since D.C.F. had obtained the order of temporary custody over him. The judge also noted Aaron's "intense dislike for and distrust of Phillip. . . ." Mem. of Decision, 1/21/03, Def. Ex. D. Plaintiffs also state in their complaint that Phillip Inkel was accused of sexually abusing Aaron and that Meredith LaBella refused to cooperate in Aaron's mental health treatment because she refused to authorize administration of anti-depressants or any D.C.F. involvement with the family at all.

Plaintiffs also allege that they left Abigail Baker in the care of her grandmother for an extended period of time, which apparently eventually led to D.C.F. involvement in her case as well. As is evident from Judge Taylor's decision, as of the time the complaint was filed in this case, Abigail remained with her grandmother after D.C.F. obtained an order of temporary custody over her.

Reading the complaint in the light most favorable to the pleaders, plaintiffs do not allege the existence of any information they believe D.C.F. should have considered and provided to the juvenile courts that would have resulted in the Inkel parents retaining custody of their children. Their conclusory allegation that the orders of temporary custody were based on false information, without any allegation of what additional or correct information should have been submitted, or how such information would have resulted in the juvenile court reaching different conclusions, is insufficient to state a claim against the

Commissioners for failure to train and supervise the staff concerning provision of information to the juvenile courts. On the contrary, the information in the complaint and stated on the record in the juvenile court proceedings indicates the courts' grounds for affirming the orders of temporary custody over the Inkel and Baker children.

▮ Likewise, plaintiffs fail to state a claim against the Commissioners for failure to properly train employees concerning entry into a private residence to pursue an abuse or neglect investigation. With respect to the October 5, 2004 "search" that ended in D.C.F. taking temporary custody of Anastasia, Andrew and Alexander Inkel, plaintiffs do not allege that they refused to consent to this home visit or that there were any other circumstances rendering the visit unlawful or unwanted.

With respect to the May 2004 home visit in which a state trooper, allegedly speaking for D.C.F., threatened the landlord that he would "make this place look like Bagdad [sic]," there is no allegation that the state trooper was trained or supervised by D.C.F. or D.S.S., or that these departments in any way gave him permission to speak for them; it is not a reasonable inference that the Commissioners of D.C.F. and D.S.S. are responsible for supervising the actions of a state police officer. Moreover, the threat is alleged to have been made against the landlord, not the plaintiffs. There is no allegation that the plaintiffs even were present at the home at this time, or that they refused to consent to the search. *Cf. State v. Brunetti*, 276 Conn. 40, 52, 883 A.2d 1167, 1175 (Conn.2005) (when joint occupants both are present, both must assent for the consent to search to be valid). Rather, the complaint suggests that the Inkels were not present at all, which is why the trooper was addressing the landlord.

Similarly, plaintiffs allege that defendants Corsini and Lenney told another landlord that plaintiffs were drug addicts and child abusers, resulting in plaintiffs' eviction. However, they do not allege that this home visit led to any unlawful interference with their relationship with their children. The only improper behavior alleged during a search of the plaintiffs' residence in February 2003 was that a state trooper drew his pistol and refused to leave after being asked four times; there is no allegation that any D.C.F. worker was responsible for the trooper drawing his weapon, or was aware that plaintiffs wanted them to leave. There is also no allegation that plaintiffs had refused permission for the home visit when it began. Finally, plaintiffs allege that in February 2002, various D.C.F. defendants caused the police to enter plaintiffs' home "without judicial authority" and cause property damage. There is no allegation, however, that D.C.F. personnel actually instructed or were trained to condone police damage to property during the course of a search or a child protection home visit. There are also insufficient allegations from which the Court can infer that plaintiffs had refused to consent to this search.

For these reasons, plaintiff's complaint fails to state sufficient facts from which it could be inferred that the Commissioners failed to properly train or supervise their employees to carry out child protective responsibilities, including home visits, or that such failure would result in harm to plaintiffs. The claims against the Commissioners for damages on this basis therefore are dismissed.

### J. Claims for Damages Against Corsini, Lenney, Suroviak, Barber, and Jennings

▮ For the same reasons, plaintiffs fail to state a § 1983 cause of action

against D.C.F. employees Corsini, Lenney, Suroviak, Barber or Jennings. First, the claims concerning submission of false testimony and documents to the state courts have been dismissed. Second, plaintiffs have failed to allege facts from which it could be inferred that these defendants unlawfully interfered with the parents' constitutional right to the care, custody and control of their children, because they have alleged no facts which, if proved, could support the inference that their children were not, in fact, abused, neglected or abandoned. As discussed above, plaintiffs have acknowledged that the juvenile courts upheld the temporary D.C.F. custody of these children on the grounds of a likelihood of abuse, neglect or abandonment, and they have alleged no facts which, if known to the juvenile courts, would have led to a different result.

■ Additionally, to the extent plaintiffs' complaint can be construed to allege a § 1983 claim that these D.C.F. defendants failed to protect the Inkel and Baker children from abuse in foster care, plaintiffs have stated no facts from which it can be inferred that these defendants knew or should have known of any abuse perpetrated by foster parents. The only specific allegation in the complaint is that LaBella found a bruise on Andrew Inkel but D.C.F. investigated and found nothing. To the extent the complaint alleges any wrongdoing, it alleges that the foster mother attempted to confuse D.C.F. personnel by representing that Alexander was Andrew and thereby hiding the bruise. The complaint fails to allege any ongoing pattern of abuse by the foster parents that D.C.F. personnel should have detected but failed to discover. *Cf. Doe v. N.Y. City Dept. Social Servs.*, 649 F.2d 134 (2d Cir.1981) (child welfare officials neglected to discover six-year pattern of cruelty and sexual

abuse by foster father despite routine home evaluations).

Finally, for the reasons discussed above, plaintiffs also have failed to state a claim against these defendants for unlawful entry into their home because they have not alleged facts from which it can be inferred that these defendants entered plaintiffs' home on any occasion without consent. Plaintiffs' allegations either are directed toward the police officers who accompanied the D.C.F. employees or to the landlords who gave consent to the searches. In none of the instances have plaintiffs alleged that they did not actually consent to the home visits by the D.C.F. employees themselves.

Therefore all claims against these employees for damages for unwarranted interference with their parental rights or unlawful home entry are dismissed.

### K. Claims for Injunctive Relief

Plaintiffs demand a broad injunction ordering defendants "to opperate [sic] lawfully, effectively and consistent with the scope of their respective authorities" and "perpetually enjoining all defendants from engaging in the unlawfull [sic] conduct described in the ... complaint." Because plaintiffs have failed to state claims for any past violations of their constitutional or common law rights, plaintiffs cannot demonstrate that any defendant, in the future, is likely to violate their rights or otherwise cause them harm that is legally redressable in federal court. Therefore plaintiffs' demands for injunctive relief must be denied.

### IV. CONCLUSION

Accordingly, defendants' Motions to Dismiss [Docs. ## 93, 102] are GRANTED and the complaint is dismissed in its entirety. The Motion to Seal the juvenile court documents [Doc. # 92] is GRANT-

ED. Plaintiffs' Ex Parte Motion for a Temporary Restraining Order [Doc. # 50] and Motion to Be Heard [Doc. # 80] are DENIED. The Clerk is directed to close this case.

IT IS SO ORDERED.